UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Ernest Garrett, | Court File No.: 0:22-cv-01640-ADM-JFD |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT AND JURY DEMAND** |
| Boston Scientific Corporation, and Selsa Castillo | |
| Defendants. | |

COMES NOW Plaintiff Ernest Garrett ("Garrett" or "Plaintiff"), for his Complaint against Boston Scientific Corporation ("BSC") and Selsa Castillo (collectively "Defendants"), states and alleges as follows:

## INTRODUCTION

1. Boston Scientific touts itself as a modern Company that fosters "a diverse, equitable and inclusive culture," claiming that "[e]veryone should be empowered to be their authentic selves at work." Additionally, amid the recent killings of George Floyd and Daunte Wright, BSC's Executive Leaders in Minnesota, sent out a Company-wide email titled "Supporting our Black Employees." Unfortunately, in reality, BSC still has a long way to go in creating a diverse and equitable work environment, especially one that supports its Black workers. Plaintiff dedicated almost two decades working at BSC's Maintenance Department, where he was continuously subjected to racial microaggression as well as blatantly discriminatory remarks. Despite his good faith attempts to report

1

discrimination within the Company and make the work environment equitable to the next generation of Black BSC employees, he was falsely accused of lunging at a female employee and terminated from his employment.

## PARTIES

2. Garrett is a Black/African-American man, who resides in Albertville, Minnesota.

3. Defendant BSC is a corporation with its principal place of business located in Marlborough, Massachusetts.

4. At all times relevant hereto, Defendant Selsa Castillo was a Senior Employee Relations Representative at BSC and a resident of Minnesota.

5. At all times relevant hereto, Garrett and BSC were "employee" and "employer," respectively, within the meaning of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.03, subds. 15 and 16.

## JURISDICTION AND VENUE

6. This is an action brought to remedy BSC's discriminatory conduct directed at Garrett on the basis of his race and sex and Defendants' retaliatory conduct after he reported discrimination.

7. Garrett invokes the jurisdiction of this Court because the violations of law described herein occurred in the State of Minnesota and involve Minnesota law, and because Defendant Castillo is a resident of Minnesota.

8. At all times relevant hereto, Garrett worked at 1 Scimed Pl., Maple Grove, MN 55311.

9. Venue is appropriate in this Court pursuant to Minn. Stat. § 542.09, because BSC has an office or business place within the borders of Hennepin County.

## FACTS

10. Garrett started his employment at BSC in 2003 as a Maintenance Technician.

11. As evidenced by 18 years working for the Company, Garrett was a good employee and was qualified for his position.

12. Throughout his long tenure at BSC, Garrett was the only African American employee in the Maintenance Department.

### *Garrett experiences continuous discrimination at BSC*

13. Throughout his employment at BSC, Garrett was continuously subjected to microaggressions and occasional blatant discriminatory statements. Unfortunately, the following examples are not an exhaustive list of discriminatory remarks and jokes he was subjected to.

14. Between 2014 and 2016, Garrett experienced continuous microaggressions from his former supervisor Ken Decker, who often told racist stories and made racist remarks.

15. For example, Decker liked to tell a story about a Black Sergeant, during the Korean War, whose skin was so dark that he would only be seen when the fire from the explosions would light up the night sky, and further stated that even then only the Sergeant's teeth and eyes were visible (alluding to old anti-Black imagery that empathized Black characters' white eyes and teeth).

3

16. Garrett also remembers Decker's habit of violating his personal space by either attempting to physically dust him off or to rub his head, stating that Garrett was "dusty as a horse" or asking what he was putting on his "shiny head." Decker also once told Garett, that he reminded him of "that blind Black guy," referring to Ray Charles. Garrett never witnessed Decker make similar comments or violate personal spaces of white employees in a similar manner.

17. Decker additionally exhibited differential treatment towards Garrett, often raising his voice at him during the morning staff meetings and demeaning any of Garrett's recommendations. Garrett never witnessed Decker treat white employees in this manner.

18. In November 2014, Garrett was physically assaulted by Tom Hiatalia, a white, male co-worker.

19. Immediately after the incident, Garrett reported the incident to BSC HR Specialist Julie Mikolich, and additionally attempted to report the differential treatment and discriminatory sentiment he was experiencing at BSC.

20. In response, Garrett was approached by BSC's Head of Security, who in a threatening tone stated that he used to be a cop in New York in the 90s, and that he knew how to "handle people from New York." Garrett, who is from New Jersey, considered this statement a threat, meaning if he continued to complain, he would be dealt with in a way Black people in New York were, and still are, treated by the police (racially profiled and often physically assaulted). This discriminatory and retaliatory statement was made in front of HR Mikolich who did not react in any way.

4

21. Moreover, Garrett, up until the end of his employment with BSC, was subjected to microaggressive comments about Black culture from Senior Facilities Technician Mike Fearing. Fearing told Garrett odd stories of hanging out with "brothers" in Harlem and eating collard greens and cornbread in Louisiana. Garrett also remembers one occasion Fearing laughed at a picture of a Black man, whose Afro was "shaped as a ball cap." After making a tone-deaf joke, Fearing would often ask Garrett "I can make jokes like this with you, right?" signaling that he understood that his so-called "humor" was inappropriate.

22. Unfortunately, Fearing's discriminatory treatment did not apply only to Garrett. He also remembers Fearing bragging of how he instigated a conflict with a Black Security Guard and then reported the Black man for speaking up to him, leading to the Guard's termination.

23. The repeated microaggressive and racially inappropriate jokes and comments by Decker and Fearing, made Garrett feel like he did not belong at BSC and made it hard for him to perform his duties.

24. In 2016, Garrett started to report to Ravi Limkar and soon after reported to him discrimination and differential treatment he had experienced from Decker and Fearing, including his concerns of being underpaid compared to his white counterparts. Limkar in response shut down Garrett's complaint by stating "there is no racism." He then clarified his statement, by saying "there is no racism at Boston Scientific."

25. Despite his diligent work performance, Garrett, who is Black and 6`2, was often portrayed as aggressive. Garrett remembers working on his own, doing pest control,

5

when Limkar told him to "watch his body language" because it was "disrespectful." Garrett found this dangerous accusation to be rooted in racial bias, accusing a Black man of being "aggressive" and his body language to be "disrespectful," perpetrates the stereotype that Back men are violent.

26. His direct supervisor's denial of his good faith report of racial discrimination and a threat to "watch his body language," while he performed daily tasks, further contributed to Garrett's feeling that he did not belong at BSC due to his skin color and made it harder for him to perform his daily tasks.

### *Garrett Reports Discrimination*

27. After the murder of George Floyd, BSC issued a public letter condemning the "*death*" of Mr. Floyd and promising to "continue to talk about discrimination and injustice because dialogue—and action—is the path to a better future."

28. Hopeful that BSC would finally seriously accept and investigate his concerns of discrimination at the Company, Garrett reached out to BSC's upper-management and executives for help.

29. In January 2021, Garrett made a protected report of discrimination and differential treatment to the Director of Global HR and EEO Ebony Travis.

30. On March 24, 2021, Garrett made a similar report to HR Director Kenneth McKee. Additionally, in May of 2021, Garrett started talks with Senior Employee Relations Representative Selsa Castillo about the discrimination he had experienced at BSC. Whenever Garrett brought up discrimination issues to Castillo, she asked him to keep

6

the complaints confidential, making him feel like his complaints were not important to BSC.

31. All parties acted as if they have taken Garrett's concerns seriously, but never followed up with him or started an investigation.

32. Moreover, at least on three occasions in 2021, Garrett met with BSC Vice President of Operations Matt Lavelle and reported discrimination he witnessed and experienced at BSC. After listening to Garrett, Lavelle empathetically stated that Garrett's experience "sounds exhausting." The last conversation with Lavelle took place in the summer of 2021.

33. During the summer of 2021, the Maintenance Department had two Black students interning at their facilities. In July, a Black male intern approached Garrett and complained about Fearing's racially inappropriate jokes, including referring to Black interns' work as "slave labor" after he spent hours working on the rooftop and was covered in sweat.

34. After experiencing Fearing's racial jokes himself and continuously, unsuccessfully, reporting them to BSC, Garrett did not want the younger generation of Black employees at BSC to experience the same hostility that he continued to experience. Thus, Garrett reported Fearing's discriminatory statements directly to Castillo on August 9, 2021.

*35.* On October 13, 2021, Castillo informed Garrett that the matter he reported "has been looked into and … any necessary action has been taken."

***Garrett is terminated as a result of a false accusation.***

36. On October 19, 2021, Garret was called to the New Horizon Academy located on BSC campus due to issues with hot water in the building. After fixing the issue, Garrett left the premises.

37. He then again received an email from the Daycare Director Becky Zirbel who informed him that the water was still cold. After arriving back to the building, Garrett checked and confirmed with Zirbel that the water was, in fact, hot.

38. Zirbel then started to talk about other matters. Because Garrett was in a rush, he respectfully interrupted her and asked if she needed anything else now that the water issue was fixed. Zirbel's tone immediately changed and she angrily said "You will not talk to me this way."

39. Garrett, who was standing at least 5 feet away from Zirbel, was taken aback by her threat and offered to step out of the room to resolve any misunderstandings, away from the resting and the feeding of children. Zirbel refused, and Garrett left the Academy.

40. The next day, Garrett received a call from Castillo and Global Security Manager Beth Theriot. Garrett was shocked to learn that Zirbel accused him of lunging at her.

41. After Garret explained what actually happened, Castillo politely asked him to have other employees do the work at New Horizon, *if possible*.

42. Garrett was never told that he was prohibited from entering the building, nor was he provided any documentation of the same.

43. Garrett believed that after dedicating almost 20 years to the Company, BSC would see through Zirbel's false accusations as well as the discriminatory nature of her

8

actions. Specifically, Zirbel's anger over Garrett interrupting her is drenched in discriminatory rhetoric, which expects Black people to be always polite and compliant, and respond with "Yes, Ma'am." But most importantly—Zirbel's false and dangerous accusation that Garrett lunged at her, when he, in reality, was at least 5 feet away from her.

44. On October 21, 2021, Garrett was doing monthly pest control with his colleague Don Herman. As a custom, both Garrett and Herman passed through the Academy as they have done numerous times before.

45. Later that day, Garrett noticed that his badge was no longer working and he had no access to the BSC buildings. Garrett then was told by his supervisor to go home.

46. Later that evening, Garrett received a call from Castillo and Theriot who stated that Zirbel allegedly saw him at the Academy and that he was being placed on a paid leave while BSC investigates the allegations.

47. On October 27, 2021, Garrett's employment was abruptly terminated because allegedly Zirbel saw him in the building on October 21.

## CAUSES OF ACTION

### COUNT I
### RACE DISCRIMINATION IN VIOLATION OF THE MHRA
### MINN. STAT. § 363A.01, *et seq.*
### AGAINST DEFENDANT BSC

48. Plaintiff re-alleges and incorporates the above paragraphs of this Complaint as if fully re-written herein.

49. Under Minn. Stat. § 363A.08, subd. 2 "it is an unfair employment practice for an employer, because of . . . race . . . to . . . (3) discriminate against a person with respect

9

to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."

50. Defendant BSC failed to take all reasonable steps to prevent discrimination based upon Plaintiff's race from occurring.

51. By its conduct as laid out above, Defendant BSC deprived Plaintiff of equal employment opportunities and otherwise adversely affected his status as an employee.

52. By its actions as described above, Defendant BSC discriminated against Plaintiff with respect to the "hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of his race in violation of Minn. Stat. § 363A.08.

53. The unlawful employment practices complained above were intentional and were performed by Defendant BSC with malice or reckless indifference to the MHRA, which protects Plaintiff.

54. As a direct and proximate result of Defendant BSC's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount in excess of $50,000.00.

**COUNT II**
**RACE DISCRIMINATION IN VIOLATION OF THE MHRA**
**MINN. STAT. § 363A.01, *et seq.***
**(HOSTILE WORK ENVIRONMENT)**
**AGAINST DEFENDANT BSC**

55. Plaintiff re-alleges and incorporates the above paragraphs of this Complaint as if fully re-written herein.

56. Under Minn. Stat. § 363A.08, subd. 2 "it is an unfair employment practice for an employer, because of . . . race. . . to . . . (3) discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment."

57. Defendant BSC's conduct constitutes a violation of Minn. Stat. § 363A.08.

58. Defendant BSC failed to take all reasonable steps to prevent racially-hostile work environment, including unwelcome racial harassment from occurring.

59. The racial harassment was severe and pervasive, making it difficult for Plaintiff to perform his job.

60. By its conduct as laid out above, Defendant BSC deprived Plaintiff of equal employment opportunities and otherwise adversely affected his status as an employee.

61. By its actions as described above, Defendant BSC discriminated against Plaintiff with respect to "hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of his race in violation of Minn. Stat. § 363A.08.

62. The unlawful employment practices complained above were intentional and were performed by Defendant BSC with malice or reckless indifference to the MHRA, which protects Plaintiff.

63. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount in excess of $50,000.00.

## COUNT III
## REPRISAL IN VIOLATION OF THE MHRA
## MINN. STAT. § 363A.15
## AGAINST ALL DEFENDANTS

64. Plaintiff re-alleges and incorporates the above paragraphs of this Complaint as if fully re-written herein.

65. The MHRA provides that it is an "unfair discriminatory practice for any individual . . . to intentionally engage in any reprisal against any person because that person . . . (1) opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter . . ." Minn. Stat. § 363A.15.

66. By his conduct as described above, Plaintiff engaged in activity protected by MHRA by making reports of race discrimination to Defendants.

67. By their conduct as laid out above, Defendants engaged in reprisal in violation of Minn. Stat. § 363A.15.

68. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of income, emotional distress, and other damages in an amount in excess of $50,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ernest Garrett respectfully requests that the Court enter judgment in his favor, for the following relief:

a. That the practices of Defendants complained of herein be adjudged, decreed, and declared to be violations of the rights secured to Plaintiff;

b. That Defendants be required to make Plaintiff whole for its adverse, discriminatory, retaliatory, and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor;

c. That Plaintiff be awarded front pay and the monetary value of any employment benefits he would have been entitled to in his position with Defendant BSC;

d. That a permanent prohibitory injunction be issued prohibiting Defendants from engaging in the practices complained of herein this Complaint;

e. That Plaintiff be awarded compensatory damages, including loss of past and future income, emotional distress, loss of reputation, and related damages in an amount to be established at trial;

f. That the Court award Plaintiff his reasonable attorneys' fees, costs, and disbursements pursuant to state law; and

g. For all relief available for Defendants' violations of Minn. Stat. § 363A.01, *et seq.*;

h. That the Court grant such other and further relief as it deems fair and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE AVAILABLE.**

Dated: June 23, 2022

**HALUNEN LAW**

*/s/ Maria B. Shatonova*
Colin J. Pasterski, #398493
Maria B. Shatonova, #401081
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
pasterski@halunenlaw.com
shatonova@halunenlaw.com

***ATTORNEYS FOR PLAINTIFF***

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated: June 23, 2022

*/s/ Maria B. Shatonova*
Maria B. Shatonova, #401081