## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Ernest Garrett, | ) | Case No. 0:22-cv-01640-ADM-JFD |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S** |
| v. | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF** |
| Boston Scientific Corporation, | ) | **ITS MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| | ) | |

Plaintiff Ernest Garrett's ("Plaintiff") employment with defendant Boston Scientific Corporation ("BSC") was a constant balancing act between his insubordinate and abrasive actions and his technical proficiency. Ultimately, the balance tipped to termination when, in October 2021, Plaintiff (already on a Final Written Corrective Action), got into a reported altercation with one of BSC's on-site daycare providers and was told not to return to the daycare while BSC investigated the matter. Nevertheless, just two days later, Plaintiff admittedly and deliberately ignored that direction and returned to the daycare, causing further disruption with the daycare provider. Because of this insubordination, BSC justifiably terminated Plaintiff's employment on October 27, 2021.

Despite Plaintiff's unacceptable and insubordinate behavior, he alleges that BSC discriminated against him and subjected him to a hostile work environment based on his race (African American) and retaliated against him for engaging in protected conduct (complaining of discrimination) under both the Minnesota Human Rights Act (Minn. Stat.

§363A.01-44) and 42 U.S.C. §1981. Because nothing in the record supports Plaintiff's claims, BSC is entitled to summary judgment.

## FACTS

### I.   Overview of Plaintiff's Employment.

BSC hired Plaintiff in August 2003 to work as a Facilities Technician II responsible for performing maintenance around BSC's Maple Grove campus. (Declaration of Terran Chambers ("Chambers Dec.") Ex. A (Plaintiff Dep.) 31:11-32:25). BSC promoted Plaintiff to Facilities Technician III in 2013. (Chambers Dec. Ex. B; Plaintiff Dep 75:24-76:3.)

Plaintiff received a copy of BSC's Code of Conduct upon hire and always had access to it. (Plaintiff Dep. 29:11-16, 31:11-32:8; Chambers Dec. Ex. C.) He received regular training on it and understood he was expected to act professionally at all times and refrain from verbally or physically mistreating others. (Plaintiff Dep. 28:14-29:4, 30:4-31:8.)

Plaintiff's supervisors included:

| Supervisor | Timeframe |
|---|---|
| Bradley Huber | 2003-2005[1] |
| Gary Glawe | 2005-2007[2] |
| Ken Decker | 2007-2016[3] |
| Mike Helser | 2016 (interim)[4] |
| Ravi Limkar | 2016-2019[5] |
| Dan Matko and Ravi Limkar | 2019-2021[6] |

---

[1] (Plaintiff Dep. 24:11-19.)
[2] (*Id.* at 43:1-11.)
[3] (*Id.* at 56:2-9.)
[4] (Declaration of Emily Colletti ("Colletti Dec.") ¶3.)
[5] (Chambers Dec. Ex. D (Limkar Dep.) 8:14-19; Plaintiff Dep. 95:13-14.)
[6] (Chambers Dec. Ex. E (Matko Dep.) 9:21-25; Plaintiff Dep. 37:6-8; Chambers Dec. Ex. F.)

Beginning in 2016, Limkar reported to Emily Colletti, Director of Facilities. (Chambers Dec. Ex. G (Colletti Dep.) 8:6-10, 11:8-16.) Colletti reported to Matt Lavelle, Vice President of Operations. (*Id.* at 40:16-18.)

As discussed below, Plaintiff's employment ended on October 27, 2021, following a series of acts of misconduct.

## II.     2016: Plaintiff Reports to Mike Helser Temporarily.

Every one of Plaintiff's supervisors counseled him on the need to improve his communication style, which was frequently described as "harsh," "rude," and "aggressive." (Chambers Dec. Exs. H-M.) These issues became increasingly problematic as Plaintiff's tenure with BSC lengthened.

For example, in May 2016, Plaintiff's interim supervisor (Helser) emailed Plaintiff asking whether he was overdue in completing a required training module. (*Id.* Ex. L; *see also* Ex. N.) Plaintiff responded: "[i]f you know this much, keep digging you will find the answer" and, later: "I will gladly explain why I DO NOT want to take any direction from you[.]" (*Id.* Ex. L.) When asked to explain, Plaintiff testified "if he was doing his job proper, he would have noticed that I had already completed [the training module]." (Plaintiff Dep. 93:14-22.) When asked in his deposition why he did not simply respond that he had already completed the module, Plaintiff testified, true to form: "Because I wanted— I chose this way. That's why." (*Id.* at 93:14-22.)

Following conversations with Julie Mikolich, Human Resources Business Partner, and Lynn Prust, BSC's Director of Employee Relations, Plaintiff (and Helser) received

counseling regarding appropriate communication. (Declaration of Julie Mikolich ("Mikolich Dec.") ¶¶4-9, Exs. A-C.)

### III.   2017 and 2018: Plaintiff Engages in Altercations with BSC Vendors.

The counseling did not have the desired impact. In July 2017, Plaintiff engaged in an altercation with a contractor working at a café on BSC's campus. (Chambers Dec. Ex. O; Mikolich Dec. Ex. D; *see also* Plaintiff Dep. 97:20-23, 99:3-100:4.) In response to the contractor's request that Plaintiff fix the ice machine, the contractor reported that Plaintiff made statements including "what's with your attitude?", "your pants are up your ass," that he "didn't give a fuck," and "if they don't replace [the ice machine], you're fucked." (Mikolich Dec. Ex. D, BSC_000896.)

Plaintiff admits that he engaged in the heated exchange and may have used profanity. (Mikolich Dec., Ex. D, BSC_000891; Plaintiff Dep. 97:20-23, 99:3-100:4.) Nonetheless, Plaintiff stated that he felt his actions were warranted because he felt "disrespected" by the vendor and "when I feel disrespected I will stick up for myself. No one can fix that for you." (Mikolich Dec. Ex. D, BSC_000893; *see also* Plaintiff Dep. 101:10-20, 102:2-17.) According to Plaintiff, if he's giving back the disrespect he perceives he is getting, his actions are always appropriate. (Plaintiff Dep. 102:11-17.) "[W]hen people do feel disrespected by me, it's because they're disrespecting me [first]." (*Id.* at 101:15-18.)

Plaintiff's supervisor (Limkar) issued Plaintiff a Verbal Counseling for this incident. (Chambers Dec. Ex. O.) The counseling reminded Plaintiff that he must "maintain professional conduct in all of [his] work activities as well as in any/all interpersonal

communications in the workplace," and "treat all co-workers, employee[s], customers, vendors, and contractors, with the utmost respect and courtesy." (*Id.*) BSC also reminded Plaintiff that if someone disrespected him,[7] he was to report it to his manager or HR; he was <u>not</u> to "handle it" himself by reciprocating disrespect. (*Id.*; Mikolich Dec. ¶¶12-13.) The counseling further warned Plaintiff that "[f]ailure to demonstrate and sustain an acceptable level of performance" may result in the termination of his employment. (*Id.*)

Ultimately, Plaintiff admitted the Verbal Counseling was warranted because he "could have just walked away [from the vendor.]" (Plaintiff Dep. 103:20-25.)

Notwithstanding, months later, in April of 2018, Plaintiff felt disrespected by a carpet vendor and reported that he had "handled it" by telling the vendor to "fuck off." (Mikolich Dec. Ex. E, BSC_001256; Mikolich Dec. at ¶14; Plaintiff Dep. 106:5-15.) Mikolich again reminded Plaintiff of his obligation to treat others with respect and to raise issues to HR <u>before</u> they escalate. (Mikolich Dec. ¶14.)

In August of 2018, Casey Walz, the Director of BSC's daycare vendor, New Horizon Academy, reported an uncomfortable conversation with Plaintiff. (Declaration of Selsa Castillo (Castillo Dec.) Ex. I, BSC_001050-52.) New Horizon is an independent daycare center located on BSC's campus offering daycare services to BSC employees.

---

[7] When asked about this incident in his investigative interview, Plaintiff defaulted to reporting the ways *he* was mistreated: contractors and vendors mistreated him, the people in the café "don't take [his] word," Helser treated him badly, and his work environment was generally hostile. (Mikolich Dec. Ex. D, BSC_000891-92.) Plaintiff recounted an incident from 2014 where a coworker pushed him and was fired the next day. (*Id.*) Plaintiff offered no specific examples of present conduct conducive to investigation. (Mikolich Dec. ¶13).

(Mikolich Dec. ¶15.) The facility requires extremely tight safety and security protocols to ensure the safety of children—for example, if employees do not have children in the facility, they are not permitted access. (*Id*.) Plaintiff had access to New Horizon to complete certain maintenance projects and developed a poor relationship with the daycare's employees. (*Id*.) Walz reported to BSC that she asked Plaintiff to modify his approach toward daycare staff, "because he always seem[ed] to come off irritated and [caused the daycare employees to] always feel like [they were] bothering him or [placing] a burden [on] him…." (Castillo Dec. Ex. I, BSC_001051.) Walz reported that Plaintiff's "tone of voice and noise level escalated very quickly" during conversation and "made [her] feel very uncomfortable." (*Id.*) Plaintiff was, once again, counseled regarding BSC's expectation that he abide by the Code of Conduct in his communications with others. (Mikolich Dec. Ex. E, BSC_001256.)

## IV.    **2019: Plaintiff Receives a Final Written Warning Following a Security Incident and his Insubordination.**

On March 10, 2019, a BSC employee fell and broke his ankle. (Mikolich Dec. Ex. E.) When a member of BSC's security team reviewed security footage for the employee's workers' compensation claim, Plaintiff walked behind the security officer and recorded the video on his cell phone without the officer's knowledge. (*Id*.) Plaintiff shared the video with others and accused the employee of faking the fall to defraud the workers' compensation system, all in violation of BSC policies, and despite the fact that employee suffered a broken ankle. (*Id.*)

Plaintiff also was insubordinate during BSC's ensuing investigation. (*Id.*) Plaintiff refused to meaningfully participate, refused to answer where he obtained the security footage, denied recording the footage, and denied showing it to anyone. (*Id.*) Security footage from that day confirmed that Plaintiff was lying. (*Id.*; Chambers Dec. Ex. P (Theriot Dep.) 14:8-17, 16:1-17.)

In his deposition, Plaintiff readily admitted that: (1) he recorded the security footage on his cell phone; (2) he refused to answer how he obtained the footage when asked; (3) he showed the video to others and stated that the employee faked the slip and fall to obtain workers compensation benefits; and (4) it was possible he lied during the investigation. (Plaintiff Dep. 106:25-109:8.)

Based on these actions, Limkar issued Plaintiff a Final Written Corrective Action ("FWCA").[8] (Chambers Dec. Ex. Q; Plaintiff Dep. 109:9-11.) The FWCA addressed not only the security footage incident, but the previous incidents of inappropriate conduct toward BSC vendors. (Mikolich Dec. Ex. E; Chambers Dec. Ex. Q.) Specifically, Plaintiff was <u>again</u> reminded that he was "expected to refrain from any inappropriate comments or language and to treat all co-workers and contractors with the utmost respect and courtesy," that he was expected to raise any workplace concerns to his manager and/or HR <u>before</u> escalating them himself, and that his "failure to demonstrate and sustain an acceptable level

---

[8] While Plaintiff contends he was not the only one who recorded the incident on his cell phone that day, he was not able to identify anyone else who also recorded the incident, and security footage confirmed he acted alone. (Plaintiff Dep. 110:10-19; Mikolich Dec. ¶17; Declaration of Beth Theriot ("Theriot Dec.") ¶5.)

of performance" could result in the termination of his employment. (Chambers Dec. Ex. Q.)

Many, like Mikolich, believed BSC should have discharged Plaintiff at this point based on his pattern of misconduct. (Mikolich Dec. ¶19.) Ultimately, given Plaintiff's technical proficiency, Limkar made the decision to give him another chance—a decision Colletti supported.[9] (Declaration of Ravi Limkar ("Limkar Dec.") at ¶ 4; Colletti Dec. ¶4.)

## V.     2020: Plaintiff Discusses Discrimination

In May of 2020, following George Floyd's death and the ensuing racial tensions, BSC engaged in efforts to foster productive dialogue about race among its employees. (Plaintiff Dep. 114:17-115:10.) BSC hosted a panel called "Getting Real About Racism in America"—a panel all BSC employees were invited to attend. (*Id.* at 115:4-16.)

Following this panel, from May of 2020 to March of 2021, Plaintiff alleges he reached out to several individuals to discuss his thoughts, including Lavelle, Ebony Travis, BSC's Director of Global Human Resources Policy, and Kenneth McKee, BSC's Director of Human Resources. (Plaintiff Dep. 118:3-119:5, 134:1-138:22.) Plaintiff remembers little about what he said, testifying only he told Lavelle that there were "certain individuals" at BSC who were "extremely toxic" and that he told McKee that he was discriminated against by Mike Fearing and Mike Helser (neither of whom were his manager), Decker (who was by then deceased), Glawe (a former employee and his manager 15 years prior), and Limkar (his skip level manager). (*Id.* at 136:9-25, 137:24-138:14.) It is undisputed that

---

[9] As he did every year, Limkar approved a merit increase for Plaintiff in conjunction with his 2019 performance review. (Mikolich Dec. ¶20.)

Plaintiff did not provide any specific allegations capable of investigation. (*Id.* 118:3-119:5, 132:12-19, 136:7-25, 138:9-10; Declaration of Ken McKee ("McKee Dec.") ¶4.)

## VI.   **2021: BSC Investigates Plaintiff's Discrimination Complaints.**

In May 2021, Plaintiff reported discrimination to Selsa Castillo, Employee Relations Representative. (Castillo Dec. Ex. A.) Castillo interviewed Plaintiff on May 25, 27, June 2, 22, July 1, August 9, and October 13, 2021. (*Id.*; Plaintiff Dep. 140:8-13, 148:19-23) Within days of making his initial report, Plaintiff received a merit-based pay increase.[10] (Mikolich Dec. ¶20.)

In his interviews with Castillo, Plaintiff reported allegations about his manager (Limkar), including:

- Limkar did not give Plaintiff sufficient raises or bonuses. (Castillo Dec. Ex. A, BSC_001013.)

- Limkar was dismissive of Plaintiff and walked by him like his phone was more important. (*Id.*; Plaintiff Dep. 142:15-18.)

- Limkar cut Plaintiff off and changed the subject in conversation. (Plaintiff Dep. 143:10-11.)

- Limkar talked to Plaintiff "in a disciplinary way." (Castillo Dec. Ex. A, BSC_001019.)

- Limkar told Plaintiff to "watch [his] body language" (*Id.* at BSC_001012; Plaintiff Dep. 121:18-22), including one instance where a BSC employee accused Plaintiff of being disrespectful and Plaintiff asked Limkar how he was

---

[10]At the same time, Plaintiff received an additional wage adjustment as a result of BSC's regularly scheduled global market assessment of pay rates. (Mikolich Dec. ¶21.) BSC conducts such global assessments on a regular basis to ensure employees' wages are keeping up with changes in their respective markets. (*Id.*) Following BSC's 2021 audit, Plaintiff (and others, including at least one Caucasian employee on his team with similar tenure) received such wage adjustments. (*Id.*)

disrespectful. Limkar, who was not present for the incident, remarked it could have been Plaintiff's body language. (Castillo Dec. Ex. A, BSC_001018; Plaintiff Dep. 126:17-127:12.)

- Limkar once told Plaintiff he did not believe that a BSC employee who reported Plaintiff for being disrespectful was motivated by racism. (Castillo Dec. Ex. A, BSC_001013; Plaintiff Dep. 121:15-16; Limkar Dec. at ¶ 5.)

- After a fire on the roof of a building, Plaintiff investigated and told Limkar what needed to be done. (Castillo Dec. Ex. A, BSC_001014; Plaintiff Dep. 122:20-123:5.) Limkar told Plaintiff not to go on the roof as it was the subject of an insurance investigation. (Castillo Dec. Ex. A, BSC_001014; Limkar Dec. at ¶ 6.)

- Limkar asked Plaintiff about errors in written reports that Plaintiff did not believe he made. (Castillo Dec. Ex. A, BSC_001028).

Plaintiff also reported allegations about one of his colleagues, Mike Fearing, including:[11]

- Fearing asked Plaintiff to look at a sliding door and Plaintiff told him he had something more important to do. Fearing got upset and said Plaintiff "poo-poo'd" him (Castillo Dec. Ex. A, BSC_001013, 1018);

- Fearing once said "are you getting testy with me!" (*Id.* at BSC_001015);

- Fearing bragged about arguing with a black security officer and told Plaintiff about it, which Plaintiff believed demonstrated white privilege (*Id.* at BSC_001019);

- Fearing allegedly asked a Muslim intern if Muslims who wear hijabs have stronger faith than Muslims who do not wear hijabs and made a comment about "slave labor" to a black intern (not to Plaintiff). When Plaintiff reported these incidents to Castillo, they were separately investigated, and Plaintiff was

---

[11] Though not reported to Castillo, Plaintiff testified to additional examples of alleged discrimination by Fearing included (1) stating "Oh you live in Albertville, Minnesota. It's really racist."; (2) going to marches and protests and sending Plaintiff pictures to suggest he was "championing" racial justice issues; (3) remarking that a Black man's hair in a photograph looked like a ball cap; (4) talking to Plaintiff about Black history generally; (5) telling Plaintiff he stopped watching The Daily Show when Trevor Noah took over, without explaining why he stopped watching at that point. (Plaintiff Dep. 152:25-153:24.)

informed of the conclusion of the investigation (but not of the outcome). (*Id.* at BSC_001031, -33, -35.)

Plaintiff also reiterated experiences he had faced years prior, including:

- Decker sharing "racist stories" before his death in 2016 (*Id.* at BSC_001012);

- Plaintiff being wrongly accused of lying about recording the surveillance video in 2019 (which Plaintiff now admits was actually true) (*Id.* at BSC_001013);

- An employee getting physical with Plaintiff in 2014 and not getting fired until the following day. (*Id.* at BSC_001013).

Castillo spoke to many others during her investigation, including Mikolich, Limkar, Fearing, Colletti, McKee, and Prust from May to October of 2021. (*Id.* at Exs. A-D.)

On October 13, 2021, Castillo told Plaintiff that the investigation relating to Fearing's alleged comments to interns had been looked into and appropriate action had been taken. (Castillo Dec. Ex. A, BSC_001035.) Castillo informed Plaintiff that she was continuing to investigate his discrimination concerns. (*Id.* at BSC_001036.)

Notwithstanding, due to Plaintiff's subsequent actions that month (discussed below), Castillo did not formally close out this investigation for a number of months. (Chambers Dec. Ex. R (Castillo Dep.) 73:7-15.)

## VII.   October 18, 2021: Plaintiff Has an Altercation with a New Horizons Employee and Is Instructed Not to Return to the Daycare.

On October 18, 2021, New Horizon reported difficulty getting hot water—a problem Plaintiff had previously addressed. (Plaintiff Dep. 157:5-15.) Plaintiff went to the facility and spoke with a New Horizon employee named Becky Zirbel. (*Id.* at 157:14-22.) As Plaintiff explained:

> She was trying to explain to me the history of hot water. I didn't have the time. She kept talking and I was trying to explain to her that I had already explained to the individuals who were working in there, what to do, and to call me direct if what I—the instructions I give you is not sufficient. And she proceeded to tell me that I'm not going to disrespect her and took a stance. And I said, "I feel the same way: disrespected." And I asked her to come outside so we can—so I can really explain to her, you know, what the issue was. And she refused. So I left.

(*Id.* at 158:9-21.)

Zirbel and her staff reported to Helser (their point of contact at BSC) that Plaintiff "was very disrespectful to [Zirbel]" and "start[ed] coming at her in a way that made her feel intimidated," triggering a panic attack. (Castillo Dec. Exs. E, F; Chambers Dec. Ex. S (Mikolich Dep.) 19:11-18; Theriot Dep. 18:24-19:2.) Other New Horizon employees submitted written statements, one reporting that Plaintiff "walked/lunged" at Zirbel. (Castillo Dec. Ex. F.)

BSC investigated, led by Castillo and Beth Theriot, BSC's then-Security Director. (Castillo Dec. ¶6; Theriot Dec. ¶6.) In addition to Plaintiff, Castillo and Theriot received input from Colletti, Helser, Matko, Zirbel, and the other New Horizon witnesses. (Castillo Dec. Exs. G-K; Theriot Dec. ¶8.) While providing Castillo with context for the parties' relationship, Helser expressed frustration: "It seems amazing to me that since 2014, the Maple Grove BSC culture is expected to be followed by all employees except for [Plaintiff]. In that case it's all a misunderstanding and others need to adapt to [Plaintiff]." (Castillo Dec. Ex. G.) Colletti agreed that Plaintiff was a "common denominator" in incidents over the years but stated BSC must "follow [its] process" to ensure a thorough, impartial investigation. (*Id.*)

Castillo and Theriot interviewed Plaintiff on October 19, 2021. (Castillo Dec. Ex. I, BSC_001046.) Plaintiff admitted he "may have" cut Zirbel off in conversation and that he "[did] not care if she felt [he] was rude" because the water issue was resolved. (*Id.* at BSC_001047; Plaintiff Dep. 160:3-23.) When asked if he lunged at Zirbel, Plaintiff laughed loudly and stated, "I hope that answers your question." (Castillo Dec. Ex. I at BSC_001047.)

Thereafter, Castillo advised Plaintiff not to re-enter the childcare facility while the investigation was pending:

> At this time my guidance is that you should not be going to the childcare center while this investigation is taking place, there needs to be a level of separation between yourself and Becky. I will speak with Dan and let him know as well but someone else will need to be responding to work orders at this time you should not be.

(*Id.*, BSC_001048; Theriot Dep. 35:10-36:22; Castillo Dep. 132:6-10.)

Castillo ended her interview with Plaintiff by again reiterating the direction:

> Thank you Eli we will reach out if there are more questions in the time being, we need to create a level of separation you should not be going to the childcare center for anything until the investigation is complete.

(Castillo Dec. Ex. I, BSC_001048.)

In his deposition, Plaintiff did not dispute he received this directive, but stated it made him mad—he did not believe he should have to modify his routine based on Zirbel's "falsif[ied] information." (Plaintiff Dep. 161:24-162:7; Castillo Dec. Ex. I, BSC_001048.) Accordingly, he did not find the instruction important: "I remember her saying we needed to be separated or something to that degree, but I didn't regard it as anything—how should

I say?—significant because the—there was no issue in my mind." (Plaintiff Dep. 161:9-23.)

As part of the investigation, Castillo, Theriot, and others reviewed security footage provided by New Horizon. (Castillo Dep. 102:1-6.) The footage (which did not contain audio) supported that while Plaintiff took a step toward Zirbel, he did not "lunge" at her. (*Id.*; *see also* Castillo Dec. Ex. H.) At most, the two engaged in a heated exchange. (Castillo Dec. Ex. H.)

Ultimately, following several communications between Theriot, Castillo, McKee (HR Director), Colletti (Facilities Director), and Lavelle (VP Operations), by the morning of October 21, 2021, BSC concluded that (1) Zirbel may have been projecting past personal trauma onto Plaintiff, and her allegations were largely not supported; (2) some (including New Horizon and Helser) had developed a bias against Plaintiff based on a belief he should have been terminated for past infractions; and (3) terminating Plaintiff's employment was not warranted based on the October 18, 2021 altercation.[12] (Castillo Dec. Ex H; Theriot Dec. Ex. A; Castillo Dep. 116:25-117:12, 118:4-119:6; McKee Dec. ¶¶5-6, Ex. A; Colletti Dec. ¶7; Colletti Dep. 66:7-19.)

Had Plaintiff's involvement with the New Horizon staff ended there, he may not have even received corrective action at all. (Castillo Dep. 35:1-7.) But it did not.

---

[12] Notwithstanding, McKee recognized that Plaintiff "struggles to consistently work with others, particularly when he feels he's right," and that he has "a direct communication style that usually ignites a situation rather than deescalating it."[12] (McKee Dec. Ex. A.) Colletti similarly noted that Plaintiff's repeated altercations did not "align with our core values" despite being provided multiple opportunities for change. (Colletti Dec. Ex. A.)

VIII.   **October 21, 2021: Plaintiff Returns to the Daycare and His Employment Ends.**

Later, on October 21, 2021, Plaintiff was leading a pest control vendor around campus to perform pest control maintenance. (Plaintiff Dep. 163:1-19; Limkar Dep. 12:2-16.) All facilities technicians are capable of performing this task.[13] (Matko Dep. 30:18-31:20; Castillo Dec. Ex. I, BSC_001046.)

Notwithstanding the directive he received two days earlier, his Final Written Corrective Action, and his long history of counseling regarding respectful workplace conduct, Plaintiff led the pest control vendor through the daycare facility on the afternoon of October 21, 2021. (Plaintiff Dep. 163:1-19.) Zirbel reported that Plaintiff peered directly into her office, triggering a "full panic attack". (Castillo Dep. 134:14-16; Castillo Dec. Ex. N.) The New Horizons staff called Colletti to report that Plaintiff had returned, and Colletti could hear Zirbel "wailing" in the background. (Colletti Dec. Ex. B, BSC_001627.)

Lisa Larson, the Vice President of Human Resources for New Horizon, emailed Castillo and Theriot, upset that BSC had not honored its commitment to keep Plaintiff out of the daycare facility until the matter was resolved, resulting in an extreme emotional reaction from Zirbel and a distraction from business needs. (Castillo Dec. Ex. M.)

Helser (BSC's vendor manager) shared his documentation of the incident and expressed frustration that BSC had failed to make its contractors feel safe on campus. (*Id.*, Exs. N; I, BSC_001042-43.) Helser noted that Zirbel was a necessary asset to BSC

---

[13] While Plaintiff typically performs these duties, Matko could have—and would have—found someone else to do it that day if he had known Plaintiff intended to enter the daycare facility against the direction he received. (Castillo Dec. Ex. I, BSC_001039, 1046.)

employees' childcare needs, and that she now refused to return to her role until the issue was resolved. (*Id.*, Ex. I, BSC_001042-43.)

Colletti placed Plaintiff on a paid leave. (Colletti Dec. ¶9.)

Castillo and Theriot had a follow-up conversation with Plaintiff on October 22, 2021. (Castillo Dec. Ex. I, BSC_001042.) When asked why he returned to the childcare center, Plaintiff acknowledged that he was instructed not to, but stated he did not think it would be "an issue":

> I was doing pest control and **when you guys told me not to go there, you said if I have any work can you get someone else to do it** and you said you would get in touch with Dan, when I was doing pest control it was my normal routine, I did not think that passing through with pest control would be an issue.

(*Id.* at BSC_001041; Plaintiff Dep. 164:11-19 (emphasis added).) [14]

When asked whether he believed that was a "lapse in judgment," he responded "[in] [h]indsight clearly." (Castillo Dec. Ex. I, BSC_1041-42; Plaintiff Dep. 164:20-165:25.) The only justification Plaintiff offered was that performing pest control was a typical part of his job and he did not think entering the daycare facility would be "an issue," despite the explicit directive he received to the contrary. (Castillo Dec. Ex. I, BSC_1041-42; Plaintiff Dep. 164:20-165:25.)

---

[14] Plaintiff repeated this in his deposition: "Q. Did you ever go to Dan or Ravi and say, 'Hey, I'm supposed to do this today. I don't think it's a good idea given my [conversation]'? A. No. Q.…Why not? A. Because I didn't think it was an issue." (Plaintiff Dep. 163:25-164:6.)

Following the investigation, Castillo completed an Incident Report summarizing her investigation and provided the documentation to Colletti. (Castillo Dec. Ex. I; Colletti Dep. 30:9-31:18.)

Colletti terminated Plaintiff's employment on October 27, 2021, because Plaintiff "specifically went back into the day care when he was told not to." (Colletti Dep. 30:19-24, 33:7-13.) According to Colletti, "[T]here's a pattern of behavior here, and that pattern had led him to be at final corrective action already. And when you're at final corrective action, the next step, in a case that's this serious, is termination." (*Id.* at 31:14-18.)

## ARGUMENT

Despite the uncontested facts regarding his insubordination and numerous previous disciplinary actions, Plaintiff alleges that when it discharged him from employment, BSC discriminated against him based his race and retaliated against him in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §363A.08 and 42 U.S.C. §1981. (*See generally* Dkt. 47.) Plaintiff also alleges BSC subjected him to a hostile work environment under the MHRA. (*Id.*) The record does not support Plaintiff's claims and BSC is entitled to summary judgment.

### I.   **Summary Judgment Standard.**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986). To avoid summary judgment, a non-moving party may not "rest on mere allegations or denials" but must "demonstrate <u>on the record</u> the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (emphasis added) (citing Fed. R. Civ. P. 56(e)).

## II.   <u>Statute of Limitations.</u>

Claims under the MHRA have a one-year statute of limitations, calculated from the date a plaintiff files suit or an administrative charge of discrimination. Minn. Stat. §363A.28. Plaintiff filed his Charge of Discrimination on November 16, 2021. (Chambers Dec. Ex. T.) Therefore, all actions occurring before November 16, 2020 (one year) are time-barred under the MHRA.

Claims under section 1981 have a four-year statute of limitations, calculated from the date a plaintiff asserts the claims. *Barber v. Halverson*, 2021 WL 5998573, at *3 (D. Minn. Sept. 15, 2021) (citing *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 372, 383-84 (2004); *Jackson v. Homechoice, Inc.*, 368 F.3d 997, 999 (8th Cir. 2004)). Because Plaintiff asserted section 1981 claims on December 19, 2022, all actions occurring before December 19, 2018 (four years), are time-barred under section 1981. (Dkt. 47.)

The only actionable adverse employment action Plaintiff suffered under either statute of limitation is the termination of his employment, which Plaintiff cannot show was either discriminatory or retaliatory.[15]

---

[15] While Plaintiff's FWCA occurred during the statute of limitations for a section 1981 claim (but not an MHRA claim), the record does not support that it is an adverse employment action because it did not materially affect a term or condition of his

### III.   **Plaintiff's Discharge Was Neither Discriminatory Nor Retaliatory.**

Absent direct evidence,[16] courts use the *McDonnell Douglas* burden-shifting framework for discrimination and retaliation claims. *Whitley v. Peer Rev. Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000); *Richmond v. Bd of Regents*, 957 F.2d 595, 598 (8th Cir. 1992) ("the prima facie showing for a section 1981 claim is the same as for a Title VII claim.").

For a discrimination claim, Plaintiff must first establish a prima facie case by showing that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Whitley*, 221 F.3d at 1055.

For a retaliation claim, Plaintiff must first establish a prima facie case by showing that: (1) he engaged in protected activity, (2) he suffered an adverse employment action,

---

employment. *Miron v. Minn. Mining and Mfg. Co.*, 2001 WL 1663870, at*6 (D. Minn. Dec. 19, 2001) (finding no adverse employment action where Plaintiff was placed on a corrective action) (citing *LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (stating an adverse employment action must involve a material employment disadvantage, such as a change in salary, benefits or responsibilities)); *see also Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001) ("Proof of an adverse employment action requires a '"tangible change in duties or working conditions that constitute a material disadvantage."'"). Plaintiff's FWCA did not affect any term or condition of his employment—Plaintiff remained in the same role and received a subsequent merit increase. *See* Mikolich Dec. ¶20.

[16] "Direct evidence of discrimination exists if the [plaintiff] alleges discriminatory statements by decision-makers." *Glover v. Am. Credit Acceptance*, 2023 WL 158198, at *4 (D. Minn. Jan. 11, 2023) (citing *King v. United States*, 553 F.3d 1156, 1160-61 (8th Cir. 2009)). Plaintiff has no direct evidence of discrimination. With respect to his FWCA, Plaintiff admits Limkar never made any statements about his race whatsoever. (Plaintiff Dep. 130:9-11.) With respect to the termination of his employment, Plaintiff testified he "barely knew who [Colletti] was," spoke to her very infrequently, and had "no idea" whether she bore racial animus toward him. (*Id.* at 169:18-170:2; 172:11-13.)

and (3) a causal relationship exists between the two. *Onyiah v. St. Cloud State Univ.*, 5 F.4th 926, 930 (8th Cir. 2021).

For both, BSC must then proffer a legitimate, nondiscriminatory/non-retaliatory business reason for its actions. *Id.* The burden then shifts back to Plaintiff to show that BSC's stated reason is pretext for discrimination or retaliation. *Id.*

For the reasons discussed below, Plaintiff cannot establish his burden on either claim.

A.   **Plaintiff's Discharge Was Not Discriminatory.**

Plaintiff cannot establish either a prima facie case or pretext for race discrimination with respect to the termination of his employment.

It is undisputed that Plaintiff—already on a final warning—was instructed not to return to the daycare facility pending an investigation into Zirbel's complaint. (Plaintiff Dep. 161:9-23; 163:1-165:25.) And it is undisputed that two days later, Plaintiff displayed a "lapse in judgment" and returned to the daycare facility anyway. (*Id.*) BSC determined that this act of insubordination warranted termination. (Plaintiff Dep. 164:20-165:25; Colletti Dep. 33:7-13.)

"A company's exercise of its business judgment 'is not a proper subject for judicial oversight.'" *Regel v. K-Mart Corp.*, 190 F.3d 876, 880 (8th Cir. 1999). "The employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgment made by employers, except to the extent that those judgments involve intentional discrimination." *Id.* (cleaned up).

Plaintiff can point to nothing in the record to suggest this decision involved intentional discrimination based on his race.

The sole basis for Plaintiff's discrimination claim is the alleged racism he perceived from his managers and coworkers, namely Glawe, Decker, Fearing, Helser, and Limkar, throughout his employment. (Plaintiff Dep. 173:15-25.) *But not one of those individuals played any role in the decision to terminate his employment.* (Colletti Dec. ¶12; Limkar Dep. 22:16-23:2.)

Plaintiff has no reason to conclude that the sole decisionmaker—Colletti—bore discriminatory animus toward him at all, as he "barely knew who she was" and had "no idea" whether she bore racial animus. (Plaintiff Dep. 169:25-170:2; 172:11-13 ("Q. Do you know if Emily—do you think that Emily Colletti was racist? A. I have no idea.").) Plaintiff has never—neither to Castillo in the investigation nor during his deposition in this matter—alleged that Colletti discriminated against him based on his race. (*See* Castillo Dec. Ex. A; Plaintiff Dep. 152:1-5 ("Q. And in all instances…the people you would have reported discriminating against you were Gary, Mr. Decker, Mike Helser, Mike Fearing, and Ravi Limkar? A. Yes.").)

Nor does the record support that finding. To the contrary, Colletti was Plaintiff's Director for *five years* before his employment ended, during which time Plaintiff engaged in many behavioral incidents for which he could have been discharged including the 2017 café incident, both 2018 vendor altercations, and the 2019 security footage incident after which many lobbied for the termination of his employment. (Colletti Dec. ¶4.) At no point did Colletti advocate for his discharge. (*Id.*) Even following Zirbel's October 18, 2021,

allegations, Colletti remained committed to an impartial investigation and aligned to no termination when the evidence did not support Zirbel's claims. (*Id* ¶7.) It was not until Plaintiff admittedly defied an instruction during a pending investigation while on a FWCA—an act incomparable to any other employee in the record—that Colletti terminated his employment. (*Id.* ¶11; Plaintiff Dep. 173:11-14.)

Plaintiff can point to nothing in the record to establish that Colletti was acting with intentional discriminatory animus based on his race when she made the decision to terminate his employment for insubordination. This is fatal to his claim.

### B.      Plaintiff's Discharge Was Not Retaliatory.

Nor can Plaintiff establish a prima facie case or pretext for his retaliation claim.

#### i.      Plaintiff Cannot Establish a Prima Facie Case.

In an effort to show a causal connection between his protected conduct and his discharge, Plaintiff resorts to temporal proximity: he reported concerns and the termination of his employment followed in time. (Plaintiff Dep. 178:16-179:9.)

"The cases that accept mere temporal proximity" for a prima facie case "uniformly hold that the temporal proximity must be very close." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding that a two-week gap was sufficient, "but barely so", to establish causation).

Plaintiff alleges he engaged in protected conduct in conversations with Travis, Lavelle, and/or McKee from May of 2020 to March of 2021 and reported discrimination to Castillo in May of 2021. (Castillo Dec. Ex. A; Plaintiff Dep. 118:3-119:5, 134:1-138:22, 140:8-13, 148:19-23.) Even using the latest of those dates—May of 2021—the temporal

gap between Plaintiff's protected conduct and his discharge exceeds five months, a period too long to infer a causal connection under Minnesota law. *See Onyiah*, 5 F.4th at 930 (citing *Williams v. UPS, Inc.*, 963 F.3d 803, 808 (8th Cir. 2020)) ("We have previously held that, without more, an 'interval of more than two months is too long to support an inference of causation.'"); *Lissick v. Anderson Corp.*, 996 F.3d 876, 886 (8th Cir. 2021) ("[T]he interval of two months between the complaint and [the employee's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding [of causation].."); *Halberg v. Location Servs., LLC*, 2022 WL 1004586 (D. Minn. Apr. 4, 2022) ("the three-month gap is too large to infer causation…under the MHRA").

Indeed, even if one used the *last* date Plaintiff reported allegations to Castillo during the investigation (contrary to the Eighth Circuit's practice[17])—his August 9, 2021, report regarding Fearing's interactions with BSC's interns—the temporal gap *still* exceeds two months, precluding any inference of a causal connection. *See Onyiah*, 5 F.4th at 930; *Lissick*, 996 F.3d at 886.

Further, any inference of causation based on temporal proximity necessarily erodes in light of Plaintiff's intervening act of insubordination on October 21, 2021. *Johnson v.*

---

[17] The Eighth Circuit regularly measures temporal proximity from the date of the initial protected conduct, notwithstanding any ensuing employer investigation where additional information may be disclosed. *Lissick*, 996 F.3d at 883-84 (measuring temporal proximity between plaintiff's report and the termination of his employment); *Mervine v. Plant Eng'g Servs, LLC*, 859 F.3d 519, 526 (8th Cir. 2017) (same); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851-52 (8th Cir. 2005) (same).

*Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1117 (8th Cir. 2023) (finding that the plaintiff's "behavior constituted intervening conduct that negated an inference of a causal connection"); *Schwarzkopf v. Brunswick Corp.*, 833 F.Supp.2d 1106, 1125-26 (D. Minn. 2011) (finding a verbal altercation occurring between protected conduct and suspension "eroded any causal connection suggested by the temporal proximity") (citing *Cheshewalla*, 415 F.3d at 852).

Because Plaintiff's only evidence of a causal connection fails at the prima facie case stage, BSC is entitled to summary judgment on this basis alone.

ii.   <u>Plaintiff Cannot Establish Pretext.</u>

But even if the Court found sufficient temporal proximity to establish causation for a prima facie case, Plaintiff cannot show that BSC's stated reason for termination is pretext for retaliation.

"Although close temporal proximity may suffice to establish causation, 'proximity alone is insufficient to establish pretext.'" *Hanson v. N. Pines Mental Health Ctr., Inc.*, 2018 WL 1440333, at *13 (D. Minn. Mar. 22, 2018) (citing *Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015)). "An employee's attempt to prove pretext or actual discrimination requires more substantial evidence than it takes to make a prima facie case," because "unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Smith*, 302 F.3d 827 at 834.

Nothing in the record—save for Plaintiff's speculation—supports that Colletti bore retaliatory animus toward Plaintiff based on his protected conduct. Plaintiff's report to Castillo is not the first protected conduct Plaintiff engaged in while reporting up to Colletti.

Viewed in the light most favorable to Plaintiff, he raised concerns regarding his work environment in conjunction with his 2017 investigation into the café incident (Mikolich Dec. Ex. D, BSC_000892-93), he alleged he was being "targeted" after his 2019 FWCA, (Theriot Dep. 14:18-15:10.), and he spoke with Lavelle, McKee, and Travis regarding racial tensions and his work environment from May 2020 to March 2021. (Plaintiff Dep. 118:3-119:5; 134:1-138:22.) In May of 2021, Plaintiff began the formal investigation process with Castillo to address his concerns. (Castillo Dec. Ex. A.) At no time temporally proximate to any of those acts of protected conduct did Colletti discipline or discharge plaintiff, notwithstanding multiple opportunities to do so. To the contrary, Plaintiff continued to receive merit increases every year, one after his FWCA and one *two days* after Plaintiff spoke with Castillo for the first time. (Mikolich Dec. ¶20.)

Indeed, even after Plaintiff's initial incident with Zirbel, Colletti—armed with knowledge of Plaintiff's past protected conduct (Colletti Dep. 35:5-36:8)—had concluded that the incident did not warrant termination (Colletti Dec. ¶7.) It was not until Plaintiff's deliberate insubordination two days later that Colletti terminated his employment.

Plaintiff can point to nothing in the record to permit a reasonable jury to infer that the termination of his employment was discriminatory based on his race or retaliatory based on any protected conduct. His MHRA and section 1981 claims on this ground necessarily fail.

## IV.     Defendant Did Not Subject Plaintiff to a Hostile Work Environment Under Minn. Stat. §363A.01.

Finally, Plaintiff's claim for a racially hostile work environment under the MHRA fails. To survive summary judgment, Plaintiff must establish that (1) he is a member of a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race; and (4) the harassment affected a term, condition, or privilege of employment. *Colenburg v. STARCON Int'l, Inc.*, 656 F.Supp.2d 947, 959 (D. Minn. 2009).

"This is a 'demanding' standard" because "employment-discrimination statutes are not intended to 'create a general civility code.'" *Id.* (citing *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003)). The claim is actionable only if the conduct at issue is "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Id.* "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Id.*

A court must evaluate the totality of the circumstances in deciding whether a plaintiff's work environment is sufficiently hostile, taking into consideration "the frequency of the…conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Colenburg*, 656 F.Supp.2d at 959 (citing *Arraleh*, 461 F.3d at 979).

26

A.   Plaintiff Cannot Show a Hostile Work Environment Within the Statute of Limitations.

From November 16, 2020,[18] to the end of his employment, Plaintiff has, at most, alleged minor, less-than-friendly comments made by Fearing and Limkar that fall far short of the demanding hostile work environment standard. (Castillo Dec. Ex. A.)

At most, Plaintiff told Castillo that Limkar (1) was dismissive of Plaintiff and walked by like his phone was more important, (2) cut him off and changed the subject in conversation, (3) talked to Plaintiff "in a disciplinary way", (4) said he did not believe a coworker's report of Plaintiff's disrespectful behavior was motivated by racism, (5) told Plaintiff not to go on the roof pending an insurance investigation, and (6) asked Plaintiff about errors in written reports. (*Id.*)

Plaintiff told Castillo that Fearing: (1) said Plaintiff "poo-poo'd" him when Plaintiff would not help fix a door, (2) said "are you getting testy with me!", (3) got into an altercation with a Black security officer (not Plaintiff), and (4) allegedly made race-related comments to BSC interns (not in Plaintiff's presence). (*Id.*) Plaintiff further testified that Fearing (1) stated "Oh you live in Albertville, Minnesota. It's really racist", (2) went to marches and protests and sent Plaintiff pictures to suggest he was "championing" racial justice issues, (3) remarked that a Black man's hair in a photograph looked like a ball cap, (4) talked to Plaintiff about Black history generally, (5) used to watch The Daily Show but

---

[18] The statute of limitations for this claim is one year. *See* Minn. Stat. §363A.28.

stopped when Trevor Noah (a Black man) took over as host and would not explain why. (Plaintiff Dep. 152:25-153:24.)

Not one of these comments demonstrates hostility toward Plaintiff's race. Indeed, most are not even *related* to Plaintiff's race in any way. *Arraleh*, 461 F.3d 967 at 979 ("many of the alleged comments were wholly unrelated to Arraleh's race or national origin or had a tenuous connection to them."); *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030 (8th Cir. 2005) ("Most of these offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race[.]").

The handful of allegations spanning the six years Plaintiff reported to Limkar do not meet the severe, pervasive, or physically threatening standard required by law. *See Abdel-Ghani v. Target Corp.*, 686 F.App'x 377, 378-79 (8th Cir. 2017) (affirming no hostile work environment where Palestinian immigrant comments including "go back home, go to your country," "camel jockey," "Muslim," "Arab," "terrorist," "sand nigger," and "you should be rounded up in one place and nuked" on at least ten occasions because the comments, while "morally repulsive," were not physically threatening and did not interfere with the plaintiff's work performance); *Colenburg*, 656 F.Supp.2d at 959-60 (finding no hostile work environment where alleged racially derogatory comments including use of the word "nigger" and the assignment of less preferential work assignments were not "physically threatening" and "were spread out over more than two years of employment."); *see also Smith v. DeJoy*, 2023 WL 2571829, at *5 (D. Minn. Mar. 20, 2023) (collecting cases).

Nor does the record support any of the referenced allegations affected a term of Plaintiff's employment. It is undisputed that Plaintiff continued to receive merit increases

each year he reported to Limkar. (Mikolich Dec. ¶20.) Further, not only did Limkar successfully advocate <u>against</u> Plaintiff's discharge in 2019, neither Limkar nor Fearing played any role in the ultimate decision to terminate Plaintiff's employment in 2021. (Limkar Dep. 22:16-23:2; Limkar Dec. at ¶4; Colletti Dec. ¶4.) The record simply does not support that Limkar or Fearing subjected Plaintiff to a racially hostile work environment so severe or pervasive that it impacted the terms or conditions of his employment.

B.     <u>Plaintiff Cannot Invoke the Continuing Violation Theory.</u>

Any attempt by Plaintiff to invoke the continuing violation theory to expand the statute of limitations should be rejected, as the Court "may only examine such evidence [of a continuing violation] if [Plaintiff] can also demonstrate 'evidence of a hostile working environment violation in the limitations period.'" *Smith v. Ashland, Inc.*, 250 F.3d 1167, 1173 (8th Cir. 2001); *Ratfield v. Delta Air Lines, Inc.*, 2023 WL 5178593, at *19 (D. Minn. Aug. 11, 2023) ("But 'discrete acts' within the statute of limitations 'do not make timely acts that fall outside the time period,' because a discrete act of discrimination is its own unlawful employment practice that resets the clock.'"). As discussed, Plaintiff cannot do so.

But even if the Court considered Plaintiff's time-barred allegations, the result is the same. Outside of the statute of limitations period, Plaintiff testified that Helser "used his influence to try to gain dominion" and Glawe "displayed some racist tendencies" in the form of "little jokes and comments" that he could not specifically recall. (Plaintiff Dep. 43:19-44:7; 154:17-24.) Plainly, this does not meet the "demanding standard" required to show severe or pervasive conduct altering the terms or conditions of employment. *See*

*Askari v. L.A. Fitness Intern., Inc.*, 2010 WL 3938320 at *5 (D. Minn. Oct. 5, 2010) (citing cases) (granting summary judgment where plaintiff could not recall specifics about alleged harassing conduct).

Beyond that, over the span of nine years, Plaintiff alleges that Decker: (1) hired an individual named Tom who, in 2014, hit Plaintiff during an altercation and was terminated the following day (*id.* at 56:22-66:4); (2) told a story about serving in the military with a Black man and not being able to see him at night until the sky lit up with ordinates (*id.* at 70:2-11); (3) told Plaintiff he looked like Ray Charles (*id.* at 70:21-71:8); (4) brushed dust off Plaintiff's shoulders, making him feel like a horse (*id.* at 71:13-25); and (5) told Plaintiff his beard looked like Velcro. (*Id.* at 74:6-9.)

To the extent these comments and actions can even reasonably be imputed to Plaintiff's race, they are not severe, pervasive, or physically threatening, and did not affect a term or condition of Plaintiff's employment. To the contrary, Decker was the only supervisor in Plaintiff's career who *promoted* him, the only supervisor to give him an "Outstanding" performance review, gave him regular raises, and never subjected him to an adverse employment action. (*Id.* 74:13-15; 75:8-76:3; Chambers Dec. Exs. B, K, U-W.)

At most, plaintiff alleges that (20 years before he was fired), Glawe did not promote him or give him raises and issued corrective action he believed was unwarranted. (Plaintiff Dep. 45:8-46:10). These acts cannot form a continuing violation for purposes of a hostile work environment claim because they are discrete acts that Plaintiff was required to pursue within one year. *Mems v. City of St. Paul*, 327 F.3d 771, 784-85 (8th Cir. 2003) ("A discrete act '"occurred" on the day it "happened"' and constitutes its own unlawful employment

practice."); *Radcliffe v. Securian Fin. Grp., Inc.*, 906 F.Supp.2d 874, 885 (D. Minn. 2012) ("The continuing violation doctrine does not apply to discrete discriminatory acts, such as termination [or] failure to promote…which are considered individually actionable.").

The record does not support that Plaintiff was subjected to a racially hostile work environment. BSC is entitled to summary judgment.

## <u>CONCLUSION</u>

For the reasons discussed herein, Defendant Boston Scientific respectfully requests the Court grant its Motion for Summary Judgment.

**FAEGRE DRINKER BIDDLE & REATH LLP**

Dated: December 13, 2023

*/s/ Terran C. Chambers*
Charles F. Knapp, MN Atty #0220371
Terran C. Chambers, MN Atty #0396415
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
*Chuck.Knapp@FaegreDrinker.com*
*Terran.Chambers@FaegreDrinker.com*

*Attorneys for Defendant Boston Scientific
Corporation*

US.359960247

31