## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ernest Garrett,

          Plaintiff,

v.

Boston Scientific Corporation,

          Defendant.

Court File No.: 22-cv-01640 (ADM/JFD)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

Defendant Boston Scientific Corporation ("BSC") has failed to carry its burden under Rule 56. Indeed, any reasonable review of the evidentiary record in this case confirms that a reasonable jury could readily find in favor of Garrett on his race discrimination and retaliation claims against BSC, thus precluding summary judgment. As set forth in detail below, the evidence in the record demonstrates that BSC operated a two-tiered system under which Garrett was treated far less favorably than his Caucasian counterparts. As the only African American Facilities Technician during his nearly twenty-year career at BSC, Garrett was frequently subjected to disrespect, discrimination, microaggressions, or and racial jokes, all of which were at his expense without recourse. And when Garrett complained about that conduct, BSC quickly cast Garrett as the angry, intimidating, and aggressive Black man stereotype that plagues the community in which we live and has cost the lives of countless Black men. Garrett's reports of discrimination went entirely ignored and undocumented by BSC until the murder of George Floyd, only

after Garrett elevated his concerns up to executive-level leadership. By the time BSC started to investigate Garrett's reports of race discrimination, there was a concerted effort to by BSC's managers to terminate him. That effort came to fruition in the form of false accusations that Garrett had lunged at another individual on BSC's campus, which BSC used as a pretextual reason to end his employment. Because the evidence in the record supports Garrett's claims that he was discriminated against on the basis of his race and he was retaliated against after reported discrimination, BSC is not entitled to summary judgment.[1]

## STATEMENT OF MATERIAL FACTS

### I.      Garrett's Employment and Job Duties at BSC

Garrett is a 53-year-old African American man. (Declaration of Colin Pasterski ("Pasterski Decl."), Ex. 17 (Garrett Dep.) 14:1-2, 70:1-17.) Before working at BSC, he served in the U.S. Navy from 1988 to 2002 as a propulsion engineer. (Garrett Dep. 15:4-15.)

In 2003, Garrett brought his technical knowledge and experience to BSC, where he worked as a Facilities Technician II (and ultimately as Facilities Tech III) from 2003 until

---

[1] BSC insisted on entering into a Protective Order to govern the use of purportedly confidential documents. (*See* Doc. 44.) In discovery, BSC abused the process of the Protective Order by designating virtually every document in its production, including its Code of Conduct and Plaintiff's own performance reviews as "CONFIDENTIAL." (*See, e.g.,* Chambers Decl., Exs. B-C, F, H-O, Q, U-W.) Still, BSC violated the terms of its own Protective Order by filing documents it designated as "CONFIDENTIAL" publicly. (*See, e.g.*, Doc. 62-1; Doc. 62-2; Doc. 62-3; Doc. 63-1; Doc. 64-1; Doc. 65-1; Doc. 66-1; Doc. 67-1.) While BSC appears to have violated the terms of the Protective Order, Plaintiff's filing complies with the Protective Order.

his termination on October 27, 2021. (Garrett Dep. 20:18-20; *See* Pasterski Decl., Ex. 1.) As a Facilities Technician, Garrett was responsible for performing maintenance duties around BSC's Maple Grove Campus. (Doc. 62-1, Garrett Dep. 31:11-32:25.) Throughout his nearly two-decade tenure BSC typically employed eight Facilities Technicians working three different shifts. (Garrett Dep. 33:1-9; Castillo Dep. 44-4[2].) Garrett was always the only Black member of the team. (*See* Garrett Dep. 70:12-17)

Facilities Technicians each had their own areas of responsibility, but each also performed maintenance work across BSC's entire campus, which included the New Horizon Daycare facility housed onsite. (Garrett Dep. 32:13-25.) Part of Garrett's assigned area of responsibility included managing BSC's pest control program, which included walking through the entire BSC Maple Grove Campus with a pest control vendor.[3] (Garrett Dep. 163:20-24; Castillo Dep. 56:18-57:1, 146:10-13.) In addition, Garrett's job responsibilities entailed providing limited facilities maintenance services to the New Horizons Daycare, including pest control, HVAC, electrical, and plumbing. (Garret Dep. 156:3-14.) As a general matter, Garrett's job required him to go by or through the New Horizons daycare nearly every day. (Garrett Dep. 156:15-17.)

---

[2] Excerpts of Castillo's deposition transcript are attached as Exhibit 18 to the Declaration of Colin Pasterski.

[3] This duty was particularly important because failure to conduct a required pest control walkthrough could result in non-compliance with FDA regulations and BSC's quality control system. (Garrett Dep. 208:14-21; Limkar Dep. 11:8-22.)

As indicated in BSC's Memorandum,[4] Plaintiff's supervisors included:

| Supervisor | Timeframe |
|---|---|
| Bradley Huber | 2003-2005 |
| Gary Glawe | 2005-2007 |
| Ken Decker | 2007-2016 |
| Ravi Limkar | 2016-2019 |
| Dan Matko[5] and Ravi Limkar | 2019-2021 |

As demonstrated in Garrett's performance reviews over the last 10 years of his employment, he consistently met or exceeded the expectations of his job. (Pasterski Decl., Exs. 2-8.) In addition to recognizing his superior technical proficiency, Garrett's supervisors also frequently commended him for his positive communication style and cited his consistent efforts to foster and maintain respectful working relationships (both internally with his colleagues and externally with BSC's customers and vendors).



---

[4] While BSC claims that Mike Helser was Garrett's "interim" supervisor in 2016 (Def. Mem. at 2), Garrett explained in his deposition that Helser was never his supervisor. (Garrett Dep. 85:7-86:8.)

[5] Limkar directly supervised Garrett from October 2016 until September 2019, at which point Matko began directly supervising Garrett. (Limkar Dep. 8:14-22.) As a result of Limkar's poor communication and leadership style, BSC moved Dan Matko into a Facilities Supervisor position and took away most of Limkar's direct supervisory duties. (Castillo Dep. 63:21-64:22; Colletti Dep. 49:24-50:3.) In stark contrast to Garrett's treatment, Limkar was never disciplined for his poor communication and leadership style. (*Id*.)



In its brief, BSC focuses heavily, nearly exclusively, on a handful of instances over the course of Garrett's nearly 20-year career in which he was reprimanded for being "harsh," "rude," and most often characterized as "aggressive." (Def. Mem. at pp. 3-6.) BSC's repeated reference to these instances is a red herring, of course, given that it did not terminate Garrett for those reasons. And even it weren't it is important to note that, as a Black man, Garrett is acutely aware of the "aggressive" black male stereotype that was applied against him throughout his career at BSC. (Garrett Dep. 205:5-206:10.) The incidents BSC highlights pertain to circumstances in which Garrett simply responded to other employees disrespecting him or his skills, experiences, and professional opinion. (Garrett Dep. 47:2-48:22.)

For example, with respect to the incident that occurred in July 2017, which BSC describes as an "altercation with a contractor" who was working in the BSC café,[6] it is

---

[6] *See* Def. Mem. at 4.

important to note that the "altercation" was in fact instigated by the contractor, who first raised her voice at Garrett before moving aggressively into his personal space. (Garrett Dep. 99:4-16.) As they say, it takes two to tango, and in each of the incidents that BSC describes in his memo, the other individual(s) involved – none of whom were Black, and each of whom initiated the incident or exhibited the same alleged inappropriate behavior as Garrett, thereby likewise violating the Company's Code of Conduct – did not receive discipline. Instead, in each of these incidents, BSC readily characterized Garrett as the aggressor and only disciplined him. BSC's own Memorandum concedes that Garrett raised concerns about the disparate treatment he received after responding to individuals who treated him poorly or created a hostile work environment.

> When asked about this incident in his investigative interview, Plaintiff defaulted to reporting the ways *he* was mistreated: contractors and vendors mistreated him, the people in the café "don't take [his] word, Helser treated him badly, and his work environment was generally hostile.

(Def. Mem. at p. 5 n.7.) Demonstrating the hypocritical refusal to apply its policies equally, BSC did not investigate Garrett's reports that he was being mistreated by contractors or vendors, that Helser treated him badly, or that his work environment was generally hostile. (*See* Castillo Dep. 50:1-5, 93:1-8.)

Garrett's last supervisor, Matko, appeared to understand the biased perception that only a few individuals appeared to have when communicating with Garrett, explaining that he "has a deep-sounding voice and may sound gruff, but people cannot help it." (*See* Castillo Dep. 127:22-128:1.) ██████████████████████████

██████████████████████████████████████████ (Pasterski Decl.,

Ex. 8, at Boston Scientific_000790.) BSC's Human Resources personnel acknowledged general awareness of the "aggressive Black male" stereotype, but those same individuals failed to conduct any investigation into whether any of the complaints against Garrett regarding his purported aggressive behavior were motivated by his race. (Theriot Dep. 23:12-17[7]; Castillo Dep. 22:1-19, 60:17-20.)

The message from BSC is clear. Garrett had to acquiesce to disrespectful (and oftentimes discriminatory) behavior from individuals and any other response from Garrett would be characterized as "aggressive" behavior that will result in only him (not the initial aggressor) facing discipline.

## II.    BSC's Arbitrary Enforcement of its Policies

There is no dispute BSC has written policies that prohibit individuals from acting unprofessionally in the workplace. (Doc. 62-1, Ex. C; Garrett Dep. 30:9-15; Castillo Dep. 18:21-25.) BSC also purports to have a zero-tolerance policy regarding discrimination in the workplace. (Castillo Dep. 20:16-21:1; Pasterski Decl., Ex. 9 at Boston Scientific_000003.) In theory, BSC enforces these policies equally across its workforce. (Castillo Dep. 18:21-25.) In reality, BSC applied a two-tiered system under which: (1) it enforced those policies strictly against Garrett, who is Black; (2) it applied relaxed standards to, or did not enforce its policies at all against, its non-Black employees. Below are illustrative examples of the unprofessional (and oftentimes discriminatory) conduct

---

[7] Excerpts to the deposition transcript of Theriot are attached to the Declaration of Colin Pasterski as Exhibit 22.

Garrett endured at BSC, which the Company permitted to occur without any repercussions to the offending non-Black employees.

Early in his employment, Garrett overheard a group of employees talking about hunting and making a remark that "if it was brown, it was down," and they glanced at Garrett and chuckled. (Garrett Dep. 211:12-24.)

As early as 2005, Garrett observed his supervisor, Gary Glawe, exhibit "racist tendencies" by making jokes and comments regarding other groups of individuals because of their race. (Garrett Dep. 43:5-44:23.) Garrett reported his concerns regarding Glawe's behavior to BSC's Human Resources, but no investigation or action was taken. (Garrett Dep. 44:6-45:14; *see* Castillo Dep. 50:1-5, 93:1-8.) Not only did BSC refuse to investigate Garrett's report, it did nothing to intervene when Glawe retaliated against Garrett for making that report by disciplining him for failing attending meetings that occurred when Garrett was not scheduled to work, and was thus not present at BSC. (Garrett Dep. 45:15-46:4, 51:4-55:2; *see* Pasterski Decl., Ex. 10.)

Garrett's supervisor of nearly ten years, Decker, often told racist jokes and displayed favoritism to other team members who were not Black. (Garrett Dep. 56:10-14.) For example, Decker recounted stories of serving in the Army with an African American and joking that at night he couldn't see him unless the night sky was lit up with ammunition. (Garrett Dep. 70:1-17.) Decker told this joke with a smirk on his face in front of Garrett, who was the only Black person in a group of white men. (*Id.*) Decker told this story to

8

belittle Garrett, and other individuals present, clearly appalled by such discriminatory treatment by a management official, covered their face with their hands. (*Id*.)

There are many other examples of Decker's unprofessional and racially motivated conduct towards Garrett that BSC tolerated and thereby permitted to continue.

- Decker approached Garrett while he was wearing sunglasses performing work outside and said, "oh you know who you look like? . . . what's the blind guy's name? The black one." (Garrett Dep. 70:21-71:2.)

- Decker told Garrett his facial hair looked like Velcro. (Garrett Dep. 74:6-8.)

- Decker engaged in a habit of touching Garrett and invading his personal space as a way to demean him, which Decker did not do with non-Black employees. (*See* Garrett Dep. 71:9-73:24.)

After enduring discriminatory treatment for years, Garrett eventually had enough and threatened Decker that he was going to report him to Human Resources. (Garrett Dep. 76:12-77:6.) Afterwards, Decker promoted Garrett to Facilities Tech III and rated his performance as Outstanding. (*Id*.; Pasterski Decl., Ex. 2, at Boston Scientific_000763.)

Further illustrating the disparate treatment to which BSC subjected Garrett is the fact that during the time Decker was his manager another Facilities Technician that Decker supervised, Tom Hietala, a white man, was observed to be sleeping on the job on numerous occasions yet did not face discipline. (Garrett Dep. 80:7-82:24.) Hietala also displayed acts of aggression or violence, including engaging in intimidation of a female BSC Vice President at BSC for intimidating her by following her in the parking lot with his monster truck. (Garrett Dep. 203:20-205:4.) Garrett reported Decker's inappropriate and

discriminatory conduct to Human Resources, noting that Decker treated him differently than Hietala differently, but BSC again did nothing to investigate Garrett's concerns. (Garrett Dep. 80:7-82:24, 71:9-72:14.) In yet another act of aggression, Hietala later physically struck Garrett. (Garrett Dep. 56:10-58:25.) Although Hietala was fired for the incident, Decker and BSC Security treated Garrett as if he had instigated the physical assault. (*Id*.) During the investigation into the incident, BSC's Security Officer issued an unambiguous threat to Garrett, stating "I know how to handle you. I used to be a New York cop." (Garrett Dep. 61:16-63:11.)

Again, BSC would like to characterize Garrett as the only individual who exhibited allegedly exhibited an "aggressive" communication style. That is simply not the case, as aggressive attitudes permeated BSC's Facilities Department. Yet it was only Garrett, the lone Black Facilities Technician, who was disciplined for allegedly exhibiting such behavior. For example, Dan Matko (a Facilities Technician until his promotion to Garrett's supervisor in 2019) has been identified as having an aggressive communication style, but he was never disciplined and was instead promoted to supervise Facilities Technicians in 2019. (Garrett Dep. 96:13-23; Limkar Dep. 19:12-18[8] (only identifying Facilities Technician Mike Fearing as receiving discipline).) And the biggest offender of being aggressive within the Facilities Department is Mike Helser, the white Manager of said

---

[8] Excerpts to the deposition transcript of Limkar are attached to the Declaration of Colin Pasterski as Exhibit 20.

department. (Mikolich Dep. 20:4-6.[9]) Indeed, the record reflects that Helser berates employees in a loud and profane manner and is widely known to treat everyone poorly. (Garrett Dep. 86:11-87:11, 212:5-15.) In one instance, Helser acted so aggressively and inappropriately towards a female employee that he reduced her to tears.[10] (Garrett Dep. 210:4-22.)



[13] Helser remains in a managerial role and never received any discipline. (Mikolich Dep. 19:24-20:6.) BSC required Helser to take an Emotional Intelligence course, which is an opportunity it never offered to Garrett, further illustrating the two-tiered, race-based system of policy enforcement BSC applies. (Doc. 63-1, Ex. C; Castillo Dep. 72:19-24.)

### III.   Garrett's Reports of Discrimination Following the Murder of George Floyd

Ravi Limkar became Garrett's supervisor in 2016. Limkar engaged in a practice of discrimination by ignoring Garrett, yet he listened to the advice and opinions of non-Black

---

[9] Excerpts to the deposition transcript of Mikolich are attached to the Declaration of Colin Pasterski as Exhibit 21.

[10] Helser attributes his "fiery" conduct to his Irish heritage. (Garrett Dep. 210:23-211:11.) Apparently, BSC has no problem with aggressive white Irish people. "Aggressive" Black men, of course, are a different story, as describe herein and as confirmed by the evidentiary record in this case.

[11] Garrett Dep. 210:23-211:7.

[12] Pasterski Decl., Ex. 16, at Boston Scientific_000815.

[13] Mikolich Dep. 19:1-23.

Facilities Technicians. (Garrett Dep. 122:10-18.) Limkar also approved a non-Black Facilities Technician to attend school, but he denied Garrett's request to attend school. (Garrett Dep. 119:20-120:20.) In his deposition, Garrett described reporting to Limkar the numerous incidents in which employees engaged in race-based discriminatory conduct against him, going on to explain that Limkar either trivialized Garrett's experience or completely ignored him. (Garrett Dep. 130:21-131:2.) For example, Garrett reported to Limkar that Mike Fearing (a white Facilities Technician), Helser, and Decker all engaged in discriminatory conduct or behavior towards him on the basis of his race that culminated in his disciplinary actions, which went completely ignored by Limkar. (Garrett Dep. 132:20-133:7.)

Following the George Floyd's murder, BSC sent out a companywide email condemning the murder and encouraging its workforce to support Black employees; however, nobody in Facilities Department offered Garrett support. (Garrett Dep. 114:17-115:23.) BSC held a voluntary seminar called "Getting Real About Racism," which prompted Garrett to reach out to BSC's leaders to raise the concerns of discrimination he experienced yet went unresolved for years. (Garrett Dep. 116:5-118:25.) Garrett reported discrimination to Ebony Travis, an Equal Employment Opportunity Director in Human at BSC, who seemed overwhelmed with Garrett's experience with discrimination in the Facilities Department and essentially told Garrett "Good luck" before referring him to other reporting avenues. (Garrett Dep. 132:3-11.)

Garrett also reported discrimination to BSC Vice President Matt Lavelle on at least three different occasions following the "Getting Real About Racism," presentation. (Garrett Dep. 134:1-136:22; Castillo Dep. 51:3-5) Lavelle assured Garrett that action would be taken to address his Garrett's concerns. (Garrett Dep. 137:1-6.) Around the same time, Garrett made the same reports regarding discrimination and his historical interactions to BSC Director of Human Resources, Ken McKee. (Garrett Dep. 137:7-138:1.)

Garrett was eventually connected with BSC Senior Employee Relations Representative, Selsa Castillo, to whom he reiterated his reports of discrimination. (Castillo Dep. 9:3-14.) Garrett and Castillo had numerous discussions throughout the remainder of his employment at BSC. (Castillo Dep. 37:22-38:9.) During these discussions, Castillo took comprehensive notes, which she describes as capturing verbatim what was discussed. (Castillo Dep. 39:3-40:10.) Castillo's first discussion with Garrett was May 25, 2021, which was the one-year anniversary of George Floyd's murder.[14] (Castillo Dep. 42:21-24.) During this discussion, Garrett reported that his manager "is racist." (Castillo Dep. 43:5-14.) Garrett also reported that April 2021, Limkar (his supervisor) told him that "*there is*



*no racism.*" (Castillo Dep. 44:5-20; Doc. 64-1, Ex. A at Boston Scientific_001013) (emphasis in original). This concerned Castillo and she understood to these to be "serious allegations", yet she never asked Limkar if he made that statement. (Castillo Dep. 44:15-45:11.)

Garrett also reported that he was being treated differently in terms of compensation, particularly that he was getting paid less than newly hired non-Black Facilities Technicians. (Castillo Dep. 45:25-4.) Garrett's concerns of pay discrimination turned out to be substantiated, and he subsequently received a wage adjustment. (*See* Castillo Dep. 46:5-47:2; Def. Mem. at 9 n.10.) Also during this discussion, Garrett reported that various employees, particularly Limkar and Fearing, exhibited microaggressions in the workplace and provided Castillo with examples. (Castillo Dep. 24:18-23, 26:5-27:4; Doc. 64-1, Ex. A at Boston Scientific_001013.) Garrett later reported to Castillo that Limkar and Fearing constantly ignored and dismissed him. (*Id*.; Castillo Dep. 58:24-59:5.)

Garrett also reiterated to Castillo the litany of concerns that he previously reported to Human Resources Representative Julie Mikolich, but which BSC had failed to investigate or resolve, including the discrimination he suffered during the time he reported to Decker. (Doc. 64-1, Ex. A at Boston Scientific_001012.) Castillo assumed that Mikolich looked into Garrett's concerns, but she was wrong. (Castillo Dep. 27:10-29:3.) During the course of her own investigation, Castillo requested on several occasions that Mikolich provide documentation regarding her investigations into Garrett's concerns. (Castillo Dep. 29:9-21.) Mikolich repeatedly failed to provide any documentation, which frustrated

Castillo. (*Id.*) Moreover, Mikolich admitted she was biased against Garrett and said that she believed should have been terminated years ago. (Castillo Dep. 52:1-13.) Mikolich reported to Castillo that Garrett was a gossip, yet the only example Mikolich provided involved an instance in which Garrett was engaging in the protected activity of discussing paychecks with his coworkers, which revealed that Garrett was getting paid less than his non-Black peers.[15] (Castillo Dep. 50:6-17.) Mikolich complained to Castillo that Garrett was "just drudging up the past" – despite the fact that none of Garrett's concerns were previously investigated and only concerns that non-Black individuals brought up against Garrett were thoroughly investigated and documented. (Castillo Dep. 51:21-52:1.)

On June 3, 2021, Castillo interviewed Limkar. (Castillo Dep. 59:18-22.) During the interview, Limkar acknowledged that Fearing outright refused to attend any meetings with Garrett, yet he was not disciplined for his insubordination. (Doc. 64-1, Ex. A at Boston Scientific_001023.) Instead, he was placed on a corrective action plan for unrelated performance issues. (Castillo Dep. 59:23-60:24.) Critical to Garrett's reports, Castillo never asked Limkar if he made a statement regarding there being no racism and further did not ask questions regarding Garrett's report that he was being dismissed by Limkar. (Castillo Dep. 61:8-19.) Concerningly, Limkar suggested to Castillo that he engage in retaliation by terminating Garrett and Fearing "to get rid of the problems." (Castillo Dep. 60:25-61:3.)

---

[15] It is unlawful for an employer to prevent an employee from disclosing their wages. Minn. Stat. § 181.172(a).

Castillo's investigation ultimately concluded that Garrett's reports of race discrimination, including his claim and that Limkar stated "there is no racism," were unsubstantiated. This conclusion is not surprising given that Castillo did not involve asking Limkar whether he made the statement or ask any other "probing questions" (or any questions at all, for that matter) pertaining to Garrett's report of race discrimination.

Q:   So did you ask him any questions, probing questions about race to Ravi [Limkar]?

A:   I'd have to go back to my notes and look.

Q:   Okay. If the - - if your notes show that there was no questions posed to Ravi about race, **would it be fair to conclude that you did not ask Ravi any questions about race?**

A:   **Yes.**

(Castillo Dep. 65:18-25 (emphasis added).)

On July 22, 2021, Castillo interviewed BSC Director of Operations Colletti, and informed her that Garrett made reports of race discrimination. (Castillo Dep. 62:19-13.) During this interview, Colletti told Castillo there were plans to place Limkar into a new role because there were concerns with him being in a "people leaders role" – specifically as it relates to his leadership style and communication skills. (Castillo Dep. 63:21-64:5.) Despite having recognized issues pertaining to his leadership and communication skills, Limkar was not disciplined and instead was transitioned to another management role that better fit his personality and skill set – an opportunity BSC never afforded to Garrett.

16

(Castillo Dep. 63:21-64:22; Colletti Dep. 49:24-50:3[16].) Also during Castillo's investigation, Colletti reported that Garrett "has a pattern of saying inappropriate things," but did not provide any specifics beyond that. (Castillo Dep. 66:1-6.)

On July 30, 2021, Castillo sent Colletti an email summarizing Garrett's concerns that he was being treated differently by Limkar, that Limkar made racist comments, and that he (Garrett) has been reporting his managers for years without any changes. (*See* Doc. 64-1, Ex. C.) At Colletti's deposition, she demonstrated her own bias against Garrett when, despite admitting that she had virtually no interaction with him, described him as "extremely toxic" and "the most toxic" person in the maintenance team," and going on to blame Garrett as being solely responsible for creating and fostering a toxic work environment. (Colletti Dep. 47:3-22.)

On August 9, 2021, Garrett reached out to Castillo to report new concerns of two distinct racist and Islamophobic comments made by Fearing. (Castillo Dep. 68:3-12.) Specifically, Fearing referenced "slave labor" while working on a roof with a Black college intern. (Garrett Dep. 178:22-179:11, Castillo Dep. 70:4-71:3.) Then, Fearing made a comment to a high school intern of Muslim faith who was wearing a head wrap and questioned her faith in a way that made her feel uncomfortable. (Garrett Dep. 147:13-148:2.) Specifically, Fearing asked why she didn't wear the head wrap all the time and inquired her failure to wear it all the time meant she didn't care about her religion as much

---

[16] Excerpts to the deposition transcript of Colletti are attached to the Declaration of Colin Pasterski as Exhibit 19.

as other people. (Castillo Dep. 70:4-71:3.) Garrett reported the discriminatory statements to Castillo shortly before his termination. (Garrett Dep. 178:22-179:11.) Castillo found Fearing's conduct and comments to be "very inappropriate" (Castillo Dep. 68:3-20), yet he did not receive any discipline for these two separate acts of racist and Islamophobic comments. Instead, BSC merely required him to *retake* an unconscious bias training course that BSC requires every employee go through annually. (Castillo Dep. 70:4-71:3, 71:13-72:18.) Once again BSC's message is clear: blatantly discriminatory comments are tolerated in the workforce by non-Black individuals, whereas any "direct," "harsh," or "aggressive" communication from Garrett must be swiftly punished.

On October 13, 2021, BSC informed Garrett that his allegations regarding Fearing's comments to interns were "looked into and addressed." (Castillo Dep. 72:7-19.) Castillo's investigation into Garrett's other concerns of discrimination continued and was not complete until December 2021, months after Garrett's termination from BSC. (Castillo Dep. 73:7-18.)

## IV.   Garrett is Falsely Accused of "Lunging" at Another Employee on BSC's Campus

On October 18, 2021, the New Horizon Daycare operating on BSC's Maple Grove campus reported difficulty getting hot water, which was a recurring issue, the reason for which BSC's Facility Department had repeatedly explained to New Horizon. (*See* Pasterski Decl. Ex. 11; Garrett Dep. 156:25-159:10.) Specifically, as a result of the distance between the hot water heater and the New Horizon Daycare, it simply required some time to run the water before it got hot. (*Id.*) New Horizon did not like that explanation, so its staff

18

continued to make service calls relating to the hot water issue. Garrett answered the service

call on October 18, 2021, during which New Horizon employee Becky Zirbel reiterated the

well-known history of the hot water concerns. (Garrett Dep. 156:25-159:10.)

> She was trying to explain to me the history of hot water. I didn't have the
> time. She kept talking and I was trying to explain to her that I had already
> explained to the individual who were working in there, what to do, and to
> call me direct if what I—the instructions I give you are not sufficient. And
> she proceeded to tell me that I'm not going to disrespect her and took a
> stance. And I said, "I feel the same way: disrespected." And I asked her to
> come outside so we can—so I can really explain to her, you know, what the
> issue was. And she refused. So I left.

(Garrett Dep. 158:9-21.)[17] At no point did Garrett raise his voice or otherwise disrespect

Zirbel. (Garrett Dep. 159:4-7.) Indeed upon reviewing the incident, Castillo determined

that Zirbel had an "emotional response" and experienced "some form of mental health

issue" to Garrett's presence. (Castillo Dep. 104:20-105:1, 122:9-16.)

After Garrett left, Zirbel and other staff reported Garrett. During the course of the

investigation, it was alleged that Garrett "lunged" at Zirbel. (Castillo Decl. Ex. F.) In

addition, Zirbel exhibited microaggressions towards Garrett by calling him a "yucky, scary

person," which Castillo recognized as being a "choice of words that . . . is a little odd for

her to use." (Castillo Dep. 121:20-25, 122:4-8.) Upon being presented with these false

allegations, Garrett reported that Zirbel "went all Karen on [him]". (Garrett Dep. 160:12-

---

[17] Garrett requested that Zirbel speak with him outside, because he noticed Zirbel was
getting angry and raising her voice in front of the children she was supposed to be
watching. (Garrett Dep. 158:22-159:3.)

23.)[18] Garrett also expressed frustration that he was tired of people falsely accusing him and other Black men. (Garrett Dep. 161:24-162:7.) Thankfully for Garrett, video evidence confirmed that Garrett never lunged at Zirbel or anyone else. (*See* Castillo Dep. 102:1-6.) Nobody was disciplined for falsely accusing Garrett of lunging at another individual.

As BSC continued its investigation into the false accusations, Castillo gave **guidance** to Garrett not to interact with Zirbel.

> At this time my **guidance** is that **you should not be going to the childcare center while this investigation is taking place, there needs to be a level of separation between yourself and Becky**. I will speak with Dan and let him know as well but someone else will need to be responding to work orders at this time you should not be.

(Doc 64, Ex. I at Boston Scientific_001047.)

Garrett understood Castillo's guidance to avoid interacting with Zirbel during the course of the investigation and to avoid fulfilling any work orders from the New Horizon Daycare. However, Garrett did not understand her to be issuing a mandate that he alter the performance of his required job duties to the extent that they required him to pass by or though New Horizons without interacting with the daycare's staff. (Garrett Dep. 209:11-20.) Moreover, Garrett was not under the impression that he would be terminated for doing his job, and no one told him that he would be terminated for simply being present on the daycare's premises in the performance of his normal job duties. (Garrett Dep. 209:21-25; Castillo Dep. 134:21-135:8.).

---

[18] "Karen" is a pejorative slang term for an obnoxious, angry, entitled, and often racist middle-aged white woman who uses her privilege to get her way or police other people's behaviors. *See* https://www.dictionary.com/e/slang/karen/ (last visited January 6, 2024).

### V.    BSC Terminates Garrett's Employment and Completes Its Investigation

As BSC's investigation into the false accusations of Garrett lunging at Zirbel continued, HR Director Ken McKee and Castillo recognized that BSC management/supervisory personnel were biased and had it out for Garrett. In particular, Castillo recognized that Helser (who Garrett had accused of discrimination) improperly inserted himself into her investigation. (Castillo Dep. 98:11-99:8.) ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████

As BSC's Memorandum confirms, the investigation into the daycare incident took three days and was concluded by the morning of October 21, 2021. (Def. Mem. at 14.) The investigation concluded that: (1) Garrett was falsely accused of lunging at Zirbel; (2) Garrett's mere presence sparked "some form of mental health issue" and an "emotional response" from Zirbel; and (3) members of BSC and New Horizon developed a bias against Garrett. (Def. Mem. at 14; Castillo Dep. 104:20-105:1, 122:9-16.) Despite Colletti and Helser inappropriately inserting themselves into an active investigation and exhibiting bias against Garrett, neither were disciplined. (*See* Castillo Dep. 101:7-10.) Neither Zirbel nor

any other New Horizon employee was disciplined for making false accusations against Garrett.

Later in the day on October 21, 2021, **after BSC's conclusion of the investigation** and its determination that the allegations levied ad Garrett were false, BSC's pest control vendor showed up to perform the routine and mandatory walkthrough of BSC's campus; it was Garrett's assigned job duty to accompany the vendor on that walkthrough. (Garrett Dep. 163:1-19, 164:7-165:1; Castillo Dep. 141:14-18.) Indeed, pest control was "solely" Garrett's responsibility, so he did what he always did, i.e., he led the pest control vendor through BSC's entire campus, including the New Horizon Daycare facility. (Garrett Dep. 163:20-24; Castillo Dep. 56:18-57:1, 146:10-13.) Garrett made a point to not see, interact, or otherwise engage with Zirbel. (*Id.*) If a pest control walkthrough had not been conducted, BSC ran the risk of being in violation of its quality control program, and Garrett ran the risk of being disciplined for not performing his assigned duty. (Garrett Dep. 164:23-165:3, 208:14-21; Limkar Dep. 11:8-22.)

New Horizons Daycare staff witnessed Garrett and the pest control vendor around the premises and reported that fact to BSC, which, despite having conclude that Garrett was innocent in connection with Zirbel's allegations, immediately placed him on an administrative leave of absence for a week, which continued until BSC fired him on October 27, 2021. (Garrett Dep. 166:9-12, 168:8-18.) On October 22, 2021, Garrett explained in an interview that he was merely performing his job, and he did not believe he was causing trouble. (Doc. 64-1 Ex. I at Boston Scientific_001041-42.) Moreover, Garrett

did not believe he received a clear instruction that he could not perform the requirements of his job. (Garrett Dep. 163:25-164:6.) Garrett's direct supervisor, Matko, never gave him a directive to not perform his pest control duties. (Castillo Dep. 146:6-9.)

Colletti terminated Garrett's employment, on October 27, 2021, making the decision in consultation with Castillo and McKee. (Colletti Dep. 30:25-31:18.) According to Colletti, the **only** reason for Garrett's termination is because he "specifically went back into the day care when he was told not to," as part of an investigation into false accusations raised against him. (Colletti Dep. 30:19-24.) As note above, however, Garrett did not receive a clear directive that he was prohibited from performing job duties that did not require interaction with New Horizon staff, and even if he had, BSC had already concluded its investigation and determined that Zirbel's allegations were unfounded by the time Garrett performed his pest control duties at the New Horizon Daycare.

Notably, other BSC employees correctly assumed that Garrett did not receive a clear instruction to not enter the childcare facility. (*See* Castillo Dep. 132:11-23; Pasterski Decl., Ex. 14 at Boston Scientific_001463 (███████████████████████████████

██████████████████████████████████████████████) Further demonstrating the lack of clarity regarding BSC's purported instruction to Garrett is the fact that BSC's termination paperwork incorrectly states that "**Employee was asked to stay home during investigation.**" (Pasterski Decl., Ex. 1. (emphasis added).) Accordingly, the evidence in the record, when viewed in the light most favorable to Garrett, confirms that: (1) BSC applied its policies and procedures differently, and less favorably

to Garrett than to its non-Black employees; (2) Garrett did not receive clear instructions explicitly prohibiting him from performing his job duties even at the New Horizon Daycare; (3) that BSC's investigation exonerating Garret was already complete at the time he entered the daycare while accompanying the pest control vendor; (4) BSC's leadership exhibited bias and a desire to terminate Garrett's employment before BSC completed its investigation into the daycare incident; and (5) Garrett was terminated shortly after reporting widespread discrimination at BSC.

## ARGUMENT

### I.  Legal Standard

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact only when no reasonable jury could find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is an extreme remedy and cannot be used as a substitute for trial. *Jacobson v. Maryland Cas. Co.*, 336 F.2d 72, 74 (8th Cir. 1964).

> Summary judgment is not a substitute for trial on disputed factual issues. It is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact. The jury, not the judge, is to make credibility determinations, weigh the evidence, and draw legitimate inferences from the facts.

*Continental Grain Co. v. Frank Seitzinger Storage, Inc.*, 837 F.2d 836, 838 (8th Cir. 1988) (quotation marks and citation omitted). Moreover, summary judgment is "notoriously

inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *In re: Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 185 (8th Cir. 1976).

"[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). A plaintiff's sworn testimony regarding specific facts that tend to disprove the employer's nondiscriminatory reason for termination can alone be sufficient to create a fact issue as to whether the employer's reasons for termination are pretextual. *Kenny v. Swift Transp., Inc.*, 347 F.3d 1041, 1046 (8th Cir. 2003). Even if the plaintiff predominantly relies on his own testimony to establish the factual circumstances surrounding his claims, the "self-serving nature of affidavits, interrogatory answers, or deposition testimony" does not make his evidence "inherently infirm." *Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015).

## II.    Section 1981 and MHRA Race Discrimination Claims

A plaintiff alleging race discrimination may survive summary judgment by creating an inference of discrimination under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 (1973). Under *McDonnell Douglas*, the plaintiff initially has the burden to establish the existence of a prima facie case of discrimination,[19] which creates a rebuttable presumption of discrimination. *See Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894, 897 (8th Cir.2004). The burden then

---

[19] *McDonnell Douglas Corp.*, 411 U.S. at 802.

shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision. *See McDonnell Douglas Corp.*, 411 U.S. at 802. "If the defendant provides such a reason, the presumption disappears, and the burden shifts back to the plaintiff to show that the proffered reason was pretext" for discrimination. *Lake v. Yellow Transp., Inc.* 596 F.3d 871, 873-74 (8th Cir. 2010) (quoting *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007)).

### A. Prima Facie Case

To establish a prima facie case, Garrett must simply show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination. *Lake*, 596 F.3d at 874.[20] BSC does not dispute that Garrett is a member of a protected class (Black); that he met his employer's legitimate expectations; and that he suffered an adverse employment action (he was fired). (*See* Def. Mem at p. 20.) Thus, its entire motion is based on its connection that there is no evidence in the record from which a causal connection can be inferred between Garrett's race and his termination.[21]

All of the evidence supporting causation also goes to pretext and, therefore, is discussed in more detail below. *Lake*, 596 F.3d at 874 (explaining that "[e]vidence of

---

[20] The elements of Garrett's discrimination claim under the MHRA and Section 1981 claims are analyzed under the same framework. *See Gordon v. Shafer Contracting Co.* 469 F.3d 1191, 1196 (8th Cir.2006); *Dare v. Wal-Mart Stores, Inc.*, 267 F.Supp.2d 987, 994 (D. Minn. 2003).

[21] It is important to note that the plaintiff need only make a "minimal showing" relative to causation in his prima facie case "before requiring the employer to explain its actions." *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002).

pretext, normally considered at [the final] step of the McDonnell Douglas analysis, can satisfy the inference-of-discrimination of the prima facie case"); *see also Zacharias v. Guardsmark, LLC*, No. 12-174 (RHK/FLN), 2013 WL 136240 at *5 (D. Minn. Jan. 10, 2013) (declining to discuss the final element of the prima facie case and focusing on whether there is a jury question on the ultimate question of whether discrimination occurred).

In its memorandum, BSC contends that it cannot be held accountable for discrimination because there is no evidence that Colletti, who was involved in the decision to fire Garrett, bore discriminatory animus. (Def. Mem. at p. 21.) That contention is incorrect both legally and factually. First, from a legal perspective, Garrett can prove his discrimination claim with evidence that **anyone** involved in the process leading to termination had discriminatory animus; this is known as the cat's paw theory. "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca–Cola Bottling Co. of L.A.,* 450 F.3d 476, 484 (10th Cir. 2006). Pursuant to this theory, courts have stated that an employer can be liable even "where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir.2003) (emphasis omitted); s*ee also Qamhiya v. Iowa State  Univ. of Science and Technology*, 566 F.3d 733, 742 (8th Cir. 2009) (confirming that "'an employer cannot shield itself from liability for unlawful termination by using a

27

purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design'").

In this case, several individuals were provided input into, and were involved in, the investigation that lead to the decision to terminate Garrett, including McKee, Castillo, Helser, and Theriot. (*See* Colletti Dep. 30:25-31:18; Pasterski Decl. Ex. 12.) Accordingly, it is improper to only consider Colletti's animus when deciding whether a factual dispute exists as to the motives regarding Garrett's termination.

Second, from a factual perspective, when viewed in the light most favorable to Garrett, the evidence shows that Colletti did harbor racial animus toward Garrett (or, at the very least, that there is a genuine issue of material fact in this regard). Indeed, as noted above, Colletti ignored, dismissed, and maintained a bias against Garrett that would allow a jury to conclude that Colletti's treatment towards him was motivated by his race. (*See* Pasterski Decl., Ex. 15 at Boston Scientific_001172; Castillo Dep. 76:2-25.) ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████  ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████  In short, there is ample evidence in the record from

28

which a jury infer that Colletti displayed discriminatory and retaliatory animus against Garrett.

And nothing in the cases BSC cites in its brief compels a different conclusion. Indeed, those cases simply stand for the unremarkable proposition that courts do not serve as a super-personnel department weighing different business decisions. (*See* Def. Mem. at 20 (citing *Regel v. K-Mart Corp.*,190 F.3d 876, 880 (8th Cir. 1999). The law is clear, even in the cases BSC cites; i.e., "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, **except to the extent that those judgments involve intentional discrimination**." *Regel*, 190 F.3d at 880 (emphasis added). The "super-personnel" language often used by employers at summary judgment does not abrogate the entire *McDonnell Douglas* framework that allows a party to prove discrimination/retaliation after an employer articulates a legitimate non-discriminatory reason for termination.

In short, BSC's reason for termination is not sacrosanct. Garrett has presented evidence of pretext that would allow a reasonable jury to conclude that the reason BSC has proffered for terminating him was not the real reason. An adverse employment action taken against an employee may violate the dictates of fairness and/or good business judgment and, simultaneously, be the product of discriminatory animus. The Court should reject BSC's attempt to subvert anti-discrimination and anti-retaliation laws by claiming its personnel decisions are immune from review.

**III.**   <u>**Section 1981 Retaliation and MHRA Reprisal**</u>

Garrett's Complaint also alleges claims for reprisal under the MHRA and retaliation under Section 1981. MHRA reprisal and Section 1981 retaliation claims are also evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *See Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001) (MHRA reprisal); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (Section 1981 retaliation).

**A.  Prima Facie Case of Retaliation**

To prove a prima facie case of retaliation or reprisal, a plaintiff must demonstrate that (1) he engaged in protected activity, (2) subsequent materially adverse action was taken against him by the defendant, and (3) the materially adverse actions were causally linked to the protected activity. *Ellis v. Houston*, 742 F.3d 307, 322-23 (8th Cir. 2014) (Section 1981 retaliation); *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 548 (Minn. 2001) (MHRA reprisal).

Here, BSC does not dispute that Garrett engaged in protected activity and that he suffered an adverse employment action. Therefore, the only prima facie element in dispute is whether there is a causal connection between Garrett's protected activities and his termination. Once again, all of the evidence supporting causation in the context of Garrett's prima facie case also goes to pretext and, therefore, is discussed in more detail below. *Lake*, 596 F.3d at 874; *Zacharias*, 2013 WL 136240 at *5.

**IV.** **Garrett Established a Genuine Issue of Material Fact on Pretext for His Discrimination and Retaliation Claims**

Pretext can be inferred from any evidence that allows a factfinder to determine that a defendant's reason for termination is false or not the real reason. *Wierman v. Casey's General Stores*, 638 F.3d 984 (8th Cir. 2011). Notably, a plaintiff need not directly contradict or disprove the reason for termination; instead, he need only point to "enough admissible evidence to raise genuine doubt as to the legitimacy of defendant's motive." *Id.* (quotations and citations omitted.) The evidentiary theories available to a plaintiff to establish pretext "may take a variety of forms." *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989) (citing cases). Each type of evidence is sufficient by itself, or the evidence can be viewed together to create a convincing evidentiary "mosaic of discrimination" upon which a jury could conclude that the desire to discriminate was a motivating factor in the plaintiff's termination. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Byrnie v. Town of Cromwell Bd. Of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) ("A combination of factors, any of which judged on their own would be much less compelling, provide sufficient evidence to allow a reasonable jury to conclude that [the employer's] explanation . . . was a pretext for impermissible discrimination.") Importantly, the employee need not affirmatively **prove** pretext, much less discrimination, at the summary judgment stage. *See Zacharias*, 2013 WL 136240 at n.12 (noting that plaintiff is not required to prove pretext at summary judgment, but only has to create a genuine issue of material fact in that regard). Here, Garrett has presented a litany

31

of evidence that demonstrates that BSC's reason for termination is false or not the real reason for termination.

First, BSC contends that Garrett was terminated for violating a clear directive to not go to the daycare during the course of the investigation.[22] (Def. Mem. at 17.) However, the evidence viewed in the light most favorable to Garrett shows the following that rebut BSC's reason for termination: (1) there was no clear directive to not go to the daycare – only "guidance" from Castillo, who is not his supervisor; and (2) the investigation was complete by the time Garrett conducted his pest control walkthrough at the daycare. (Def. Mem. at p. 14; Castillo Dep. 132:11-23; Garrett Dep. 209:11-25; Pasterski Decl., Ex. 14 at Boston Scientific_001463; Pasterski Decl., Ex. 1.; Doc 64, Ex. I at Boston Scientific_001047) Because Garrett has come forward with evidence that allows a reasonable jury to conclude that BSC's reason for termination is false, this matter is not appropriately decided at summary judgment.

Second, an employer's failure to follow its own policies or procedures when applied to a plaintiff may indicate an unlawful motive. *Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 871–72 (8th Cir.2009). Here, Garrett has evidence that BSC employs a practice of applying its policies and procedures strictly to him, while taking much more lenient approach to non-Black employees who engage in the same conduct BSC claims is improper when undertaken by Garrett. Throughout Garrett's near twenty-year career, BSC conducted a

---

[22] This is merely BSC's attorney-driven reason for termination. BSC's contemporaneous documentation regarding the reason for termination is that Garrett was instructed to stay home from work during the investigation, which is also not true. (Pasterski Decl., Ex. 1.)

number of investigations into his behavior, yet failed to conduct any investigations into the concerns he raised regarding unfair treatment or discrimination until after George Floyd's death. (*See* Castillo Dep. 50:1-5, 93:1-8.) Additionally, there is ample evidence that non-Black employees who were found to have behavioral or "aggressiveness" issues that violated BSC's workplace policies (including Limkar and Fearing) were permitted to transition into a different role within the Company or were simply required to retake an annual training. (Castillo Dep. 63:21-64:22, 70:4-71:3, 71:13-72:18; Colletti Dep. 49:24-50:3.) In other instances, white individuals with recognized "aggressive" personality traits in BSC's Facilities Department (*e.g.,* Matko and Helser) received no discipline or coaching. (*See* Doc. 63-1, Ex. C; Castillo Dep. 72:19-24; *see also* Limkar Dep. 19:12-18 (only identifying Fearing as having received discipline).) The disparate way in which BSC handled investigations and discipline against Garrett and the lack of investigations initiated when Garrett raised concerns demonstrate a discriminatory motive by BSC.

Third, evidence of pretext may be shown with evidence that shortcomings of an employer's investigation demonstrate that the investigation was not conducted in good faith. Indeed, as the Eighth Circuit explained in *McCullough v. Univ. of Ark. for Med. Scis.* "[t]he way in which an employer conducts a decision-making process may give rise to an inference of discrimination, giving an employee the right to proceed to trial," for example, "[c]ertain shortcomings may suggest that the investigation was so limited it is unlikely it was conducted in good faith."559 F.2d 866, 863 (8th Cir. 2009); *see also Topper v. Northwest Mechanical, Inc.,* 968 F. Supp.2d 1001, 1022-1027 (S.D. Iowa 2013) (finding,

*inter alia*, the way in which the employer conducted investigation into plaintiff's performance raised inference of discrimination). As explained above, BSC only feigned to take Garrett's reports of discrimination seriously after the murder of George Floyd. When BSC finally did commence an investigation into Garrett's reports of discrimination, that investigation lacked good faith. In particular, despite Garrett's report of discrimination by Colletti, Limkar, and Fearing, BSC failed to ask any probing questions regarding Garrett's reports of race discrimination. (Castillo Dep. 44:15-45:11, 65:18-25, 76:2-25.) In addition, Garrett reported that Limkar stated "*there is no racism*" – a statement that Castillo found serious enough to emphasize in her notes. (Castillo Dep. 44:5-20; Doc. 64-1, Ex. A at Boston Scientific_001013 (italics in original).). Castillo's failure or refusal to investigate the facts regarding Garrett's reports of discrimination at BSC demonstrates that her role was merely to rubber stamp the Company's foregone conclusion that those reports were unsubstantiated.

Fourth, biased statements or conduct by those involved in the decision to terminate have been found to be probative of pretext, even when the comments are not made in the context of an adverse employment action. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000). Here, numerous managers at BSC made biased statements or engaged in biased conduct against Garrett to the point where BSC's own Human Resources Department acknowledged it and agreed it existed. First, during Castillo's interview with Limkar, Garret's supervisor, regarding Garrett's report of discrimination, Limkar's knee-jerk reaction was to terminate Garrett. (Castillo Dep. 60:25-61:3.) ████████████

 Thus, a factual dispute remains whether the bias exhibited was motivated by Garrett's race and protected activities, making this matter inappropriate for summary judgment.

Fifth, the timing between Garrett's protected reports and his termination, in conjunction with the other evidence of pretext identified above, creates an inference of discrimination or retaliation. BSC correctly notes that the Eight Circuit has held that generally "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine fact issue on retaliation." *Smith*, 302 F.3d at 832. Here, Garrett began making protected reports of discrimination with Castillo in May 2021, and Colletti became aware of Garrett's protected activity in late July 2021, less than three months before Garrett's termination. (Doc. 64-1, Ex. C.) Garrett submitted his final report of discrimination a couple weeks later on August 9, 2021. (Castillo Dep. 68:3-12.) The import of timing is ultimately dependent on the facts of a particular case as "there is no definitive line drawn to show at what point a temporal connection establishes causation." *See EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 973 (8th Cir. 2014). Here,

in addition to the relatively tight three-month time period between Colletti learning of Garrett's protected activity and his termination, Garrett has the above-listed evidence that, in connection with (or in addition to) temporal proximity, establishes at least the existence of a fact question with respect to BSC's discriminatory and retaliatory motives.

In short, contrary to BSC's contention, Garrett does not rest on mere temporal proximity alone to prove discrimination and retaliation. Moreover, it is important to remember that an employer cannot conceal an unlawful discharge by closely observing an employee and waiting for an ostensibly legal basis for discharge to emerge. *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007); *Hamilton v. General Elec. Co.*, 566 F.3d 428, 435 (6th Cir. 2009). Here, Garrett consistently performed the job expected of him, and he had not been subjected to workplace discipline for any issues for more than two years before he was terminated for effectively doing the job that was both required and expected of him in conducting an accompanied pest control walkthrough of BSC's Maple Grove Campus. *Raddatz v. Standard Register Co.*, 31 F. Supp.2d 1155 (D. Minn. 1999) (Although the plaintiff did violate a written company policy, but the transgression was minor in light of plaintiff's performance; trier of fact could conclude that the employer's decision to terminate plaintiff, rather than imposing some less severe discipline or imposing no sanction at all, was contrived.) Accordingly, the evidence of pretext at Garrett's disposal, taken separately or together, makes this matter inappropriate for summary judgment.

## <u>CONCLUSION</u>

For the reasons discussed herein, Plaintiff Ernest Garrett respectfully requests the Court deny BSC's Motion for Summary Judgment in its entirety.

Dated: January 10, 2024                    MJSB EMPLOYMENT JUSTICE, LLP

<u>*/s/ Colin J. Pasterski*</u>
Colin J. Pasterski, #398493
Christopher J. Moreland, #278142
6400 Flying Cloud Drive, Suite 215
Eden Prairie, MN 55344
Telephone: (612) 677-2680
cpasterski@mjsbjustice.com
cmoreland@mjsbjustice.com

***ATTORNEYS FOR PLAINTIFF***