UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Ernest Garrett,<br><br>    Plaintiff,<br><br>v.<br><br>Boston Scientific Corporation,<br><br>    Defendant. | Case No. 22-cv-01640-ADM-JFD<br><br>**DEFENDANT'S REPLY<br>MEMORANDUM OF LAW<br>IN SUPPORT OF<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT** |

Plaintiff Ernest Garrett was on a Final Written Corrective Action ("FWCA") following a series of undisputed acts of misconduct and insubordination when, on October 18, 2021, he engaged in an altercation with BSC's daycare vendor. There is no dispute that following that altercation, Garrett was told: "you should not be going to the daycare center while this investigation is taking place" and "you should not be going to the childcare center for anything until the investigation is complete." And there is no dispute that Garrett did so anyway, causing further distress and disruption with the vendor.

Thereafter, Garrett's Director, Emily Colletti, made the decision to terminate his employment based on this undisputed act of further insubordination. Colletti's decision was supported by Selsa Castillo's (Employee Relations) investigation and Ken McKee's (Human Resources) guidance. Garrett has never alleged that Colletti, Castillo, or McKee discriminated against him.

Faced with these insurmountable undisputed facts, Garrett throws a series of flares intended to distract, including allegations of discriminatory conduct by unrelated actors

occurring up to 20 years before his employment ended. Garrett's efforts are futile. Garrett (1) has waived any argument as to his hostile work environment claim; (2) cannot establish a prima facie case of either discrimination or retaliation; and (3) cannot create a genuine issue of material fact regarding pretext. Accordingly, BSC is entitled to summary judgment.

### I. Garrett Abandoned His Hostile Work Environment Claim and Corresponding Continuing Violation Theory.

Garrett makes no effort to avoid summary judgment on his hostile work environment claim and has waived any argument in opposition. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734–35 (8th Cir. 2009) (finding that failure to make arguments in opposition to summary judgment constitutes waiver of those arguments). Summary judgment in BSC's favor must issue on that claim.

Left with no basis to invoke the continuing violation doctrine, there is no dispute that all allegations pre-dating December 19, 2018[1] are time-barred. (*See* Memorandum in Support of Motion for Summary Judgment ("Memorandum") at 18.)

### II. Garrett Failed to Establish a Prima Facie Case of Discrimination.

Garrett has failed to carry his burden of creating a genuine issue of material fact regarding the central issue for a prima facie case of discrimination: whether there are any facts in the record that would permit a reasonable jury to infer that **those involved in the decisionmaking process** were motivated by a discriminatory attitude. *DeRoche v. All Am.*

---

[1] This date is four years prior to Garrett's assertion of claims under 42 U.S.C. §1981. All allegations pre-dating November 16, 2020 (one year prior to filing his Charge of Discrimination) are time-barred under the Minnesota Human Rights Act.

2

*Bottling Corp.*, 57 F. Supp. 2d 791, 795 (D. Minn. 1999) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999)) ("To satisfy his initial burden, a plaintiff must demonstrate that conduct or statements by persons involved in the employer's decision-making process [are] reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that the attitude was the motivating factor in the employer's decision" (cleaned up)).

The record is clear that Colletti made the decision to terminate Garrett's employment based on a comprehensive investigative report prepared by Castillo, with guidance from McKee. (Colletti Dec. ¶12.) Garrett has never, either during his investigation at BSC, during his deposition in this matter, or in opposition to this Motion, alleged that Castillo or McKee discriminated against him. (*See* Plaintiff Dep. 152:1–5; Castillo Dec. Ex. A; Opposition to Motion for Summary Judgment ("Opposition").)

Beyond that, despite his admissions that he has "no idea" whether Colletti had a discriminatory attitude because he "barely knew who she was" (Plaintiff Dep. 169:25–170:2; 172:11–13), Garrett now contends that a jury *could* conclude Colletti harbored racial animus toward him because: (1) she described Garrett as "extremely toxic" and "the most toxic" despite having little personal interaction with him (Opposition at 17); and (2) following reports of Garrett's initial interaction with Zirbel on October 18, 2021, Colletti noted that he was consistently a "common denominator" in workplace disputes before the investigation was complete. (*Id.* at 28). Neither of these facts indicate a racial bias. That Colletti, who had been Garrett's Director for five years and had been consistently made aware of his multiple (now undisputed) workplace altercations, viewed him as a

3

common denominator in conflict and the source of toxicity on the team is a product of Garrett's admitted behavior, not his race. (*See* Colletti Dec. ¶4); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (stating that facially race-neutral statements do not demonstrate racial animus on the part of the speaker).

Recognizing that he cannot paint Colletti as a discriminatory actor, Garrett shifts to the cat's paw theory, under which an employer may be liable for discrimination when a non-discriminatory actor is merely carrying out the agenda of a discriminatory actor. *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006) ("an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design."); *see also Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) ("It describes a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.") (internal quotations omitted). For example, the Eighth Circuit has applied the cat's paw theory to find discrimination in cases where non-biased actors make decisions based solely on reports of discriminatory actors, and where discriminatory actors were involved in the decisionmaking process at every step of the way, despite not ultimately "pull[ing] the trigger." *Qamhiyah v. Iowa State Univ. of Sci. and Tech.*, 566 F.3d 733, 743 (8th Cir. 2009).

Garrett fares no better under this theory because his alleged discriminatory actors were not involved in the decisionmaking process. At all times, Garrett has maintained that

4

he was discriminated against by Glawe, Decker, Helser, Fearing, and Limkar. (Plaintiff Dep. 152:1–5; *see generally* Opposition.) Not one was involved in the decision to terminate his employment.[2] (Colletti Dec. ¶12.) Garrett's cat's paw theory fails.

Because there is no genuine issue of material fact to establish an inference of discrimination with respect to the termination of Garrett's employment, BSC is entitled to summary judgment.

### III.   Garrett Failed to Establish a Prima Facie Case of Retaliation.

Garrett offers next to nothing to show a causal connection between his reports of discrimination and the termination of his employment as required for his prima facie case of retaliation. At most, he doubles down on temporal proximity:[3] "the timing between Garrett's protected reports and his termination . . . creates an inference of . . . retaliation." (Opposition at 35.) According to Garrett, Colletti became aware of his protected activity in "late July 2021, less than three months before Garrett's termination." (*Id.*)

---

[2] Indeed, Glawe had long-since left BSC, Decker had passed away years prior, Limkar did not know BSC was terminating Garrett's employment until he was told after-the-fact, and there is no record evidence that Fearing participated in the investigation or decisionmaking process in any way. (Memorandum at 2; Colletti Dec. ¶3; Limkar Dep. 22:16–23:2.) While Helser relayed information from the daycare facility (over whom he had managerial oversight) to BSC and expressed his frustration regarding the incident initially, Castillo promptly told him she would handle the investigation and "ended the communication" with him entirely. (Supplemental Chambers Declaration Ex. X (Castillo Dep. at 100:5–101:6; 161:13–15).) Helser had no involvement in the decisionmaking process thereafter. (Colletti ¶12.)

[3] Garrett repeats that timing, "in conjunction with the other evidence" in his brief, collectively establishes an inference of causation for retaliation. (Opposition at 35–36.) But Garrett does not identify what "other evidence" supports that Colletti was acting with retaliatory animus. Indeed, none does.

In so arguing, Garrett ignores (1) the wealth of case law holding that three months is not sufficient temporal proximity to infer causation for retaliation; (2) Garrett's own intervening conduct (his October 21, 2021 insubordination) that severed any causation; and (3) the fact that after Colletti learned of Garrett's protected conduct in July 2021, she first made the decision *not* to terminate his employment following his initial interaction with Zirbel on October 18, 2021, diluting any inference of retaliatory animus. (Memorandum at 22–25.)

Because Garrett cannot establish that Colletti's decision to terminate his employment was causally connected to his protected conduct, he cannot establish a prima facie case of retaliation and BSC is entitled to summary judgment.

## IV.     Garrett Failed to Establish Pretext.

Even if Garrett could establish a prima facie case of discrimination and/or retaliation (he cannot), those claims still fail because Garrett has failed to meet his burden of establishing a genuine issue of material fact that BSC's stated reason for terminating his employment was pretext for discrimination or retaliation.

In addition to temporal proximity (discussed above), Garrett advances four pretext arguments: (1) he was never given clear instruction not to return to the daycare, (2) others discriminated against him, (3) he was disproportionately disciplined, and (4) Castillo's investigation was insufficient. (Opposition at 31–36.) Garrett's arguments fail.

At the pretext stage, "proof that the [employer's] explanation is false is necessary . . . [b]ut more is also needed." *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021) (citation omitted). "The plaintiff must also show that . . . discrimination was the real

6

reason." *Id.* (cleaned up). "Because the burden to prove pretext merges with the ultimate burden of persuading the court that [the plaintiff] was the victim of intentional discrimination, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a trier of fact to infer discrimination." *Id.* (citing *Smith v. URS Corp.*, 803 F.3d 964, 968 (8th Cir. 2015); *Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998)) (cleaned up). "The ultimate question" is whether the employer intentionally discriminated or retaliated. *Id.*

As discussed below, none of Garrett's arguments makes this showing.

**No Clear Directive.** Garrett first argues that BSC's stated reason for terminating his employment was pretext for race discrimination and retaliation because he was only given "guidance" to stay out of the daycare facility, not a "clear directive." (Opposition at 32.) Setting aside how Garrett *understood* the words spoken, it is undisputed that Castillo told Garrett: "you should not be going to the daycare center while this investigation is taking place" and "you should not be going to the childcare center for anything until the investigation is complete." (*Id.* at 20; Castillo Dec. Ex. I, BSC_001048.) And it is undisputed that notwithstanding hearing these words, Garrett returned to the daycare center, causing the vendor further disruption and emotional distress. (Opposition at 22.)

Notwithstanding, Garrett argues that by the time he returned to the daycare, the investigation was complete. (*Id.* at 32.) Garrett bases this conclusion on the representations in BSC's moving brief that by the morning of October 21, 2021, the decisionmakers had drawn conclusions about the evidence—namely, that Zirbel was likely projecting personal trauma, that some biases had developed against Garrett, and that terminating Garrett's

7

employment based on Zirbel's allegations was not warranted. (Memorandum at 14 (citing Castillo Dec. Ex. H; McKee Dec. Ex. A; Colletti Dec. ¶7).) Of course, Garrett does not allege that he was told the investigation had concluded or that the direction he received from Castillo about not returning to the daycare center had been rescinded, because neither had happened. (*See* McKee Dec. Ex. A (discussing further investigation-related tasks set to occur in the coming days).) BSC's formative conclusions about the underlying complaint are irrelevant to the fact that Garrett was told not to return to the daycare center yet did so anyway in what he himself admitted at the time was a "lapse in judgment." (Plaintiff Dep. 164:20–165:25.)

Plainly, Garrett's counsel's machinations to overcome what Garrett himself admitted was a lapse in judgment are insufficient to create a fact question regarding whether race discrimination or retaliation were the real reasons BSC terminated his employment for insubordination.

**Biased Actors.** Next, Garrett argues "biased statements or conduct **by those involved in the decision to terminate** have been found to be probative of pretext" while devoting pages of his brief to discussing the alleged discriminatory bias of those **not** involved in the decision. (Opposition at 34.) Specifically, Garrett states: (1) unnamed people once said "if it's brown, flush it down" 20 years ago; (2) Gary Glawe exhibited "racist tendencies" as his supervisor 20 years ago; (3) Ken Decker made alleged racist comments 10 years ago; (4) Julie Mikolich allegedly failed to investigate his concerns in and around 2016; (5) Mikolich and Helser represented they were "biased" in that they

8

believed Garrett should have terminated for prior infractions; and (6) Ravi Limkar ignored him and did not permit him to attend school. (*See* Opposition at 7–11.)

In addition to these allegations being largely time-barred and contradicted by the record,[4] they are wholly irrelevant to Garrett's discrimination claim because they bear no connection whatsoever to *Colletti's* decision to terminate his employment. *DeRoche*, 57 F. Supp. 2d at 795 ("'Stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself,' are insufficient to establish a causal relationship between the conduct, or statements, and the adverse employment action. **Thus, actions and comments by employees not involved in a[n] [employment] decision cannot provide a basis for charging other employees with discrimination.**") (emphasis added) (citing *Braziel v. Loram Maint. of Way, Inc.*, 943 F. Supp. 1083, 1095 (D. Minn. 1996)); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 779 (8th Cir. 1995) (affirming summary judgment for the employer where the offered evidence of discrimination was "written nearly a decade prior to [Plaintiff's] discharge," was "written by individuals not involved in the decision to terminate [Plaintiff]" and there was "no evidence connecting those memoranda to [the employer's] evaluation or decision."); *see also Butler v. I.R.S.*, 73 F. App'x 730, 732 (5th Cir. 2003) ("although Butler

---

[4] As just one example, Garrett alleges that during the investigation into the café incident, he reported that he was being mistreated by Helser and BSC's vendors and Mikolich turned a blind eye to his concerns. (Opposition at 6.) As noted in BSC's brief, Garrett reported that vendors "don't take [his] word," Helser treated him badly, and his work environment was generally hostile. (Memorandum at 5, n.7.) Beyond the relationship between Helser and Garrett (which BSC was actively addressing), Garrett offered no specific examples of mistreatment for BSC to investigate. (*Id.*) Nor does Garrett do so in his Opposition.

persuasively argues that . . .various supervisors demonstrated racial animus toward her, as the district court noted, the record does not show that the ultimate decisionmakers or those involved . . . exhibited any racial animus toward her.").

Because Garrett cannot show any connection between his allegations of discrimination by others to Colletti's decision to terminate his employment, they are irrelevant to his discrimination and retaliation claims.

**Disparate Application of Policies and Procedures.** Garrett next alleges that BSC's reason for terminating his employment was discriminatory and retaliatory because BSC applied its policies strictly to him while taking a "much more lenient approach to non-Black employees who engage in the same conduct." (Opposition at 32.) Yet, both in discovery and in his Opposition, Garrett failed to identify a single person who engaged in conduct similar to his but was treated more favorably. (Plaintiff Dep. 173:11–14.) Indeed, the record contains no evidence of any other employee who engaged in insubordination while on a FWCA and received more favorable treatment.

Instead, Garrett goes to great lengths to state that others—Helser, Hietala, Matko, Limkar, and Fearing—had "aggressive" communication styles but were not disciplined.[5] (Opposition at 10–11, 33.) Even if the record supported that any of these individuals

---

[5] It should be noted that Plaintiff's brief is replete with allegations that have absolutely no record support. Garrett makes many representations like "in each of the incidents that BSC describes in his [sic] memo, the other individual(s) involved—none of whom were Black, and each of whom initiated the incident or exhibited the same alleged inappropriate behavior as Garrett . . . did not receive discipline." (Opposition at 6.) As evidenced by the lack of citation, no part of that allegation has support in the record. Allegations unsupported by record evidence may not as a matter of law create a genuine issue of material fact. *Tweeton v. Frandrup*, 287 F. App'x 541 (8th Cir. 2008).

10

engaged in the type of profane, confrontational communication Garrett engaged in (it does not),[6] Garrett himself received only one disciplinary action for his communication style—his Verbal Corrective Action following the café incident—and he readily admitted that it was warranted given his conduct. (Plaintiff Dep. 103:20–25.) Beyond that, following numerous instances of Garrett's reported communication concerns, he received the exact treatment he alleges everyone else did: coaching. (*See* Memorandum at 3–8.) Indeed, the record shows that many at BSC spent considerable amounts of time working with Helser, Fearing, and Garrett in particular to foster better dialogue in the workplace through meetings, trainings, and written reminders. (*See id.*; Castillo Dec. Ex. A at BSC_001023; Mikolich Dec. at ¶¶5–9, Exs. A–C.)

    Regardless, this is a red herring. Plaintiff's burden is to point to facts in the record to create a genuine issue of material fact regarding whether Colletti's decision to terminate Plaintiff's employment was motivated by his actions on October 21, 2021, or whether it was actually motivated by his race and/or protected conduct. How Garrett's communication style stacked up to Helser, Fearing, Matko, and Limkar's is irrelevant because Garrett was terminated for insubordination, not for his confrontation in the daycare center that prompted the investigation.

---

[6] While Garrett reports that Helser "berates employees in a loud and profane manner" and once reduced a female employee to tears (Opposition at 10–11), he admits he does not know whether this conduct was ever reported. (Plaintiff Dep. 210:21–211:5.) Nothing in the record supports that it was. Further, it is worth noting that, in fact, Heitala was terminated for his aggressive behavior. (Opposition at 10.)

**Failed Investigations.** Finally, Garrett takes issue with BSC's investigation process, alleging that Castillo "failed or refused" to investigate his reports of discrimination. (Opposition at 34.) This argument fails for a number of reasons. First and foremost, Castillo's investigation into Garrett's discrimination report was wholly independent of the actions that led to the termination of his employment. Garrett made complaints of discrimination by Limkar and Fearing to Castillo in May of 2021, which she thoroughly investigated for several weeks. (Castillo Dec. Ex. A.) Separate and apart from that (but overlapping in time), Garrett had a confrontation with Zirbel on October 18, 2021, was told not to return to the daycare facility, and did so anyway on October 21, 2021. (Opposition at 18–22.) As part of Castillo's investigation into *that* incident—an investigation completely distinct from the one Garrett challenges—Garrett admitted his conduct and Colletti made the decision to terminate his employment. (Castillo Dep. Ex. I; Colletti Dec. ¶12.) Castillo was conducting two wholly separate investigations on parallel tracks: one into Garrett's report of discrimination against Fearing and Limkar (Castillo Dec. Ex. A), and one into the daycare incident that resulted in the termination of his employment by Colletti (Castillo Dec. Ex. I). That Garrett challenges the sufficiency of the former does not create pretext as to the outcome of the latter.

Regardless, the record, including Castillo's nearly 30 pages of investigative notes, further belies Garrett's argument. (Castillo Dec. Ex. A.) Regardless of whether Castillo asked the exact questions Garrett's counsel now believes she should have asked during the investigation, there can be no dispute that she investigated Garrett's claims thoroughly.

And even if it were otherwise, the Eighth Circuit has made clear that plaintiffs cannot show pretext by attacking the sufficiency of an employer's investigation particularly where, as here, Garrett has made no allegations of discriminatory animus against Castillo. *Roeben v. BG Excelsior Ltd. P'ship.*, 545 F.3d 639, 643 (8th Cir. 2008) ("Even if Roeben could show that the Peabody's investigation was poorly conducted or that its decision was impetuous, that alone would not allow him to survive summary judgment.") (citing *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997)).

Indeed, even if Castillo's investigation was poor (it was not) and another investigator would have concluded Limkar and Fearing *were* discriminating against Garrett (they were not), it does nothing to establish that discrimination or retaliation were the real reasons Colletti terminated Garrett's employment following his October 21, 2021, act of misconduct.

Because Garrett has failed to point to anything in the record to create a genuine issue of material fact regarding pretext, BSC is entitled to summary judgment.

## CONCLUSION

For the reasons discussed herein, Defendant Boston Scientific Corporation respectfully requests the Court grant its Motion for Summary Judgment.

**FAEGRE DRINKER BIDDLE & REATH LLP**

Dated: January 19, 2024

/s/ *Terran C. Chambers*
Charles F. Knapp, MN Atty #0220371
Terran C. Chambers, MN Atty #039641
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000

Facsimile: (612) 766-1600
*Chuck.Knapp@FaegreDrinker.com*
*Terran.Chambers@FaegreDrinker.com*

*Attorneys for Defendant Boston Scientific Corporation*