**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ernest Garrett,

        Plaintiff,

v.                                                    **MEMORANDUM OPINION**
                                                      **AND ORDER**
Boston Scientific Corporation,                        Civil No. 22-1640 ADM/JFD

        Defendant.

_____

Colin J. Pasterski, Esq., MJSB Employment Justice, Eden Prairie, MN, on behalf of Plaintiff.

Terran C. Chambers, Esq., and Charles F. Knapp, Esq., Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On January 31, 2024, the undersigned United States District Judge heard oral argument on Defendant Boston Scientific Corporation's ("BSC") Motion for Summary Judgment [Docket No. 59].  Plaintiff Ernest Garrett ("Garrett") claims that BSC fired him because of his race and in retaliation for protected activity, in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 et seq., and 42 U.S.C. § 1981.  For the reasons stated below, BSC's Motion is granted.

## II.  BACKGROUND

### A.  Garrett's Employment with BSC

Garrett worked as a Facilities Technician at BSC's Maple Grove campus from 2003 until BSC terminated his employment on October 27, 2021.  Chambers Decl. [Docket No. 62] Ex. A ("Garrett Dep.") at 31:25-32:7; Pasterski Sealed Decl. [Docket No. 75] Ex. 1.  During his long

tenure, Garrett was the only African American on a team of eight Facilities Technicians.  Garrett Dep. at 33:2-9, 70:12-14.

As a Facilities Technician, Garrett performed maintenance work across BSC's Maple Grove campus.  Id. at 32:13-25.  His assigned duties included managing the pest control program for the campus.  Id. at 156:21-23, 163:6.  Garrett's job responsibilities extended to providing facilities maintenance and pest control services to New Horizon Academy ("New Horizon"), an independent daycare center located on the campus.  Garrett Dep. at 156:4-14; Mikolich Decl. [Docket No. 63] ¶ 15.  His job required him to go by or into the New Horizon facility nearly every day.  Garrett Dep. at 156:15-17.

Garrett's supervisors at BSC included:

| Supervisor | Timeframe |
|---|---|
| Bradley Huber | 2003-2005 |
| Gary Glawe | 2005-2007 |
| Kevin Decker | 2007-2016 |
| Ravi Limkar | 2016-2019 |
| Ravi Limkar and Dan Matko | 2019-2021 |

Id. at 24:14-18, 37:6-8, 43:1-11, 56:2-9, 95:13-14; Chambers Decl. Ex. D ("Limkar Dep.") at 8:14-22.

Beginning in 2016, Limkar reported to Emily Colletti, Director of Facilities.  Chambers Decl. Ex. G ("Colletti Dep.") at 8:6-10, 11:8-16.  Colletti reported to Matt Lavelle, Vice President of Operations.  Id. at 40:16-18.

Garrett was given a copy of BSC's Code of Conduct when he was hired and maintained access to it.  Garrett Dep. at 29:9-16, 31:18-32:7; Chambers Decl. Ex. C.  He received regular training on the Code of Conduct, and understood that he was expected to act professionally in all

job-related activities and to refrain from verbally or physically mistreating others.  Garrett Dep. at 28:14-29:4, 30:4-31:7.

## B.  Garrett's Verbal Altercations with BSC Vendors in 2017 and 2018

Over time, each of Garrett's supervisors at BSC counseled him on the need to improve his communication style, which was described as "intimidat[ing]," "harsh," "rude," and "aggressive."  See Chambers Decl. Ex. H at 000724, Ex. I at 000740, Ex. K at 000754, Ex. M at 001346.  These issues spilled over into Garrett's interactions with BSC's contractors and vendors.

In July 2017, Garrett engaged in a verbal altercation with a contractor working at a café on BSC's campus.  Chambers Decl. Ex. O; Mikolich Decl. Ex. D; Garrett Dep. at 97:20-23, 98:10-18; 99:4-100:4.  The contractor reported that in response to her request that Garrett fix the ice machine, Garrett made statements including, "what's with your attitude?", "your pants are up your ass," that he "didn't give a fuck," and "if they don't replace [the ice machine], you're fucked."  Mikolich Decl. Ex. D at 000896.  Garrett admits that he engaged in the heated exchange and may have used profanity, but believed his actions were warranted because he felt disrespected by the contractor after she raised her voice at him, approached him, and got "in [his] face."  Garrett Dep. at 97:20-23, 99:13-100:4; 101:10-18; 102:2-17; Mikolich Decl. Ex. D at 000891, 000893.

Garrett's then-supervisor, Limkar, issued Garrett a Verbal Counseling for the incident. Chambers Decl. Ex. O.  The counseling reminded Garrett that he was required to maintain professional conduct in all work activities and workplace communications, and must "treat all co-workers, employee[s], customers, vendors, and contractors, with the utmost respect and courtesy."  Id. at 000798.  Garrett was warned that "[f]ailure to demonstrate and sustain an

acceptable level of performance may result in . . . termination of employment." Id. Garrett was also told by Julie Mikolich, from BSC's Human Resources department, that if someone disrespected him, he was to report it to Human Resources or his supervisor, and not "handle it" himself by reciprocating the disrespect. Mikolich Decl. ¶¶ 2, 12, Ex. D at 000893. Garrett admits that the Verbal Counseling was warranted because he "could have just walked away" from the vendor. Garrett Dep. at 103:20-25.

Months later, in April 2018, Garrett walked by Mikolich's office and told her that a carpet vendor had disrespected him and that Garrett had "handled it" by telling the vendor to "fuck off." Mikolich Decl. ¶ 14, Ex. E at 001256. Mikolich told Garrett that his actions were not appropriate and again reminded him that he should report the disrespect to her rather than handling it himself. Id. ¶ 14.

In August 2018, Casey Walz, the director of the New Horizon daycare center, reported to Facilities Manager Mike Helser that she'd had an uncomfortable conversation with Garrett. Mikolich Decl. Ex. E at 001256; Castillo Decl. [Docket No. 64] Ex. I at 001051-52. Walz asked Garrett to modify his approach toward daycare staff "because he always seem[ed] to come off irritated and [caused the daycare staff to] always feel like [they were] bothering him or a burden to him." Castillo Decl. Ex. I at 001051. Walz reported that during the conversation, Garrett's "tone of voice and noise level escalated very quickly . . . and made [her] feel very uncomfortable." Id. at 001052. After the report, Limkar again reminded Garrett that he was expected to abide by BSC's Code of Conduct in his communication with others. Mikolich Decl. Ex. E at 001256.

**C. Garrett's Final Written Warning in 2019**

On March 10, 2019, a BSC employee fell in the parking lot and broke his ankle. Mikolich Decl. Ex. E at 001254.  The next day, a member of BSC's security team was viewing security footage of the incident for the employee's workers' compensation claim.  Id.  As the officer was viewing the security video, Garrett walked behind the security officer and recorded the security video on his cell phone without the security officer's knowledge, in violation of BSC's policies.  Id.  Garrett shared the video with others and accused the employee of faking the fall to defraud the workers' compensation system.  Id.

During BSC's investigation into Garrett's conduct, Garrett refused to answer where he obtained the security footage, denied recording the footage, and denied showing it to anyone.  Id. at 001255.  BSC determined that Garrett was lying because security cameras had captured Garrett while he was recording the video on his phone.  Id. at 001254-55.  When asked about the security video incident during his deposition, Garrett admitted that (1) he recorded the security footage on his cell phone, (2) he refused to answer how he obtained the footage when asked during the investigation, (3) he showed the video to others and stated that the employee faked the slip and fall, and (4) it was possible he lied during the investigation.  Garrett Dep. at 106:26-109:8.

Based on Garrett's actions, Limkar issued him a Final Written Corrective Action ("FWCA").  Chambers Decl. Ex. Q; Garrett Dep. at 109:9-11.  The FWCA addressed the security footage incident as well as the Garrett's previous altercations with BSC vendors. Mikolich Decl. Ex. E at 01255-56; Chambers Decl. Ex. Q.  Garrett was again reminded that he was "expected to refrain from any inappropriate comments or language and to treat all co-workers and contractors with the utmost respect and courtesy," and that his "[f]ailure to

5

demonstrate and sustain an acceptable level of performance may result in . . . termination of employment."  Chambers Decl. Ex. Q at 000079.

Although Mikolich believed that Garrett's employment should have been terminated based on his pattern of misconduct, Limkar made the decision to give him another chance. Mikolich Decl. ¶ 19; Limkar Decl. [Docket No. 68] ¶ 4.  Facilities Director Emily Colletti was aware of the concerns with Garrett's conduct, including the incidents with vendors in 2017 and 2018, but supported Limkar's decision not to terminate Garrett's employment following the 2019 security footage incident.  Colletti Decl. [Docket No. 67] ¶ 4.

**D.  Garrett Reports Discrimination to BSC Starting in May 2020; BSC Investigates**

After George Floyd's murder in May 2020, BSC held a seminar called "Getting Real About Racism," which prompted Garrett to contact BSC executives and report that he had been experiencing discrimination at BSC for years.  Garrett Dep. at 114:17-119:5.  From May of 2020 to March of 2021, Garrett reported discrimination to Lavelle (VP of Operations), Ebony Travis (Director of Global Human Resources Policy), Kenneth McKee (Director of Human Resources) and Limkar.  Id. at 116:13-117:2, 118:3-119:5, 132:3-139:6.

Although Garrett remembers little about what he said during these reports, he recalls telling Lavelle that there were "certain individuals" at BSC who were "extremely toxic."  Id. at 135:24-136:25.  He also remembers telling McKee that he had experienced racism from coworker Mike Fearing, Facilities Manager Mike Helser, supervisor Limkar, and former supervisors Decker (who died in 2016), and Glawe (who had been his supervisor 15 years earlier).  Id. at 136:12-138:8.  However, Garrett does not remember specifically what he told McKee about these individuals.  Id. at 138:9-10.  McKee avers that Garrett did not provide

specific allegations of discrimination or retaliation that were capable of investigation.  McKee Decl. [Docket No. 66] ¶ 4.

Garrett was eventually directed to BSC's Senior Employee Relations Representative, Selsa Castillo, who first spoke with Garrett on May 25, 2021, and began investigating his discrimination complaints.  Id. at 139:1-10, Castillo Decl. ¶ 2, Ex. A.  Castillo alerted Facilities Director Colletti to Garrett's discrimination complaints on July 22, 2021.  Castillo Decl. Ex. A at 001030, Ex. C.

As part of her investigation into Garrett's complaints, Castillo interviewed Garrett seven times between May 25 and October 13, 2021.  Castillo Decl. Ex. A; Garrett Dep. at 140:8-13, 148:19-23.  During the interviews, Garrett told Castillo that Limkar discriminated against him by being dismissive of him, talking to him "in a disciplinary way," and using microaggressions. Castillo Decl. Ex. A at 001013, 001019, Ex. C.  Garrett also related that Limkar made racist comments to him following an incident in which another employee had accused Garrett of being disrespectful, because Limkar told Garrett that his body language might have been the reason for the employee's accusations, and that "there is no racism" motivating the employee's accusations. Castillo Decl. Ex. A at 001012-13, Ex. C; Garrett Dep. at 121:6-22; Limkar Decl. ¶ 5.

Garrett told Castillo that coworker Mike Fearing discriminated against him by (1) exhibiting microaggressions; (2) saying that Garrett was "poo-pooing" him and getting "testy" with him, and (3) bragging to Garrett about an argument that Fearing had with a Black security officer, which Garrett believed demonstrated white privilege.  Castillo Decl. Ex. A at 001014-15, 001018-19.  Garrett also alleged that Fearing also made racist comments to a Muslim intern and a Black intern at BSC.  Id. at 001030-31.  Garrett further reported that his former supervisor Decker, who died in 2016, had shared "racist stories."  Id. at 001012.

Castillo took extensive notes from her interviews with Garrett.  See Castillo Decl. Ex. A.

She also spoke with several others to investigate his allegations, including Mikolich, Limkar,

Fearing, Colletti, and McKee.  Castillo Decl. ¶¶ 3-5, Exs. A-D.  Castillo's investigation into

Garrett's claims was still ongoing at the time Garrett was fired in late October 2021.  Chambers

Decl. Ex. R ("Castillo Dep.") at 73:7-18.  Castillo closed her investigation on December 14,

2021, after finding no discrimination by Limkar or Fearing against Garrett.  Id. Ex. A at 001037.

**E.  Garrett's Altercation with New Horizon Daycare Director on October 18, 2021**

On October 18, 2021, Garrett responded to a service call from the New Horizon daycare

center about difficulty getting hot water, which was a recurring issue at the facility.  Garrett Dep.

at 155:5-22; Pasterski Decl. Ex. 11 [Docket No. 75, Attach. 10].  Garrett went to the daycare

center and spoke with New Horizon director Becky Zirbel about the hot water concerns.  Garrett

Dep. at 157:14-21.  As Garrett explained:

> She was trying to explain to me the history of hot water. I didn't have the time. She
> kept talking and I was trying to explain to her that I had already explained to the
> individuals who were working in there, what to do, and to call me direct if what I—
> the instructions I give you is not sufficient. And she proceeded to tell me that I'm
> not going to disrespect her and took a stance. And I said, "I feel the same way:
> disrespected." And I asked her to come outside so we can—so I can really explain
> to her, you know, what the issue was. And she refused. So I left.

Id. at 158:9-21.

Zirbel and other staff reported the incident to BSC Facilities Manager Mike Helser.

Castillo Decl. Exs. E, F.  They alleged that Garrett "was very disrespectful" to Zirbel and

"start[ed] coming at her in a way that made her feel intimidated," triggering a panic attack.  Id.

Ex. E at 000973.  One of the New Horizon employees alleged that Garrett "walked/lunged" at

Zirbel.  Castillo Decl. Ex. F at 000982; Chambers Decl. Ex. P ("Theriot Dep.") at 19:8-25.

Zirbel reported that she suffers from past personal trauma, and that Garrett's conduct made her

feel unsafe.  Theriot Decl. [Docket No. 65] Ex. B. at 001590.  Zirbel also feared that Garrett would retaliate against her.  Id.

The incident was investigated by Castillo and Beth Theriot, BSC's then-Security Director.  Castillo Decl. ¶ 6; Theriot Decl. ¶ 6.  Castillo and Theriot received input from Colletti, Helser, Matko (Garrett's supervisor), Garrett, Zirbel, and the other New Horizon witnesses. Castillo Decl. Exs. G-K; Theriot Decl. ¶ 8, Ex. B.

Castillo and Theriot interviewed Garrett on October 19, 2021.  Garrett admitted that he "may have" cut Zirbel off in conversation and that he "[did] not care if she [felt he] was rude." Castillo Decl. Ex. I at 001047.  When asked if he had lunged at Zirbel, Garrett laughed loudly and stated, "I hope that answers your question."  Id.  Garrett expressed frustration that he was tired of people falsely accusing him and other Black men.  Id. at 001048.

During the interview, Castillo instructed Garrett not to re-enter the childcare facility while the investigation was pending.  Specifically, Castillo told Garrett:

> At this time my guidance is that you should not be going to the childcare center while this investigation is taking place, there needs to be a level of separation between yourself and Becky. I will speak with Dan and let him know as well but someone else will need to be responding to work orders at this time you should not be.

Id. at 001048; Theriot Dep. at 35:10-36:22; Chambers Decl. Ex. R ("Castillo Dep.") at 132:6-10.

Castillo ended the interview with Garrett by again reiterating that he should not be going to the daycare during the investigation, saying:

> Thank you . . . we will reach out if there are more questions in the time being, we need to create a level of separation you should not be going to the childcare center for anything until the investigation is complete.

Castillo Decl. Ex. I at 001048.

In his deposition, Garrett acknowledges that he heard Castillo's directive, but gave it little regard: "I remember her saying we needed to be separated or something to that degree, but I didn't regard it as anything---how should I say?---significant because the---there was no issue in my mind." Garrett Dep. at 161:19-23.

The security video footage from the incident was obtained and reviewed by Castillo, Theriot, and others. Castillo Decl. Ex. H at 001455; Theriot Decl. Ex. A. The footage (which did not include audio) showed that although Garrett took a step toward Zirbel, he did not lunge at her. Castillo Dep. at 102:1-6; Castillo Decl. Ex. H at 001455; Theriot Decl. Ex. A; Colletti Dep. at 66:2-13.

During the morning of October 21, 2021, after several communications between Theriot, Castillo, HR Director McKee, Facilities Director Colletti, and VP of Operations Lavelle, it was determined that (1) Zirbel's allegations were not largely supported and she may have been projecting past personal trauma onto Garrett; (2) some members of the BSC team appeared to have developed a bias against Garrett based on his past behavior; and (3) terminating Garrett's employment was not warranted based on the October 18, 2021 altercation. Castillo Decl. Ex. H at 001455; Theriot Decl. Ex. A; Castillo Dep. at 116:11-117:12, 118:4-119:6; McKee Decl. ¶¶ 5-6; Colletti Decl. ¶ 7; Colletti Dep. at 66:11-14.

**F. Garrett Returns to Daycare on October 21 and is Fired on October 27, 2021**

Later in the day on October 21, 2021, Garrett led a pest control vendor through the New Horizon facility to conduct a routine monthly walkthrough. Garrett Dep. at 163:1-19. All Facilities Technicians are capable of performing this task. Chambers Decl. Ex. E ("Matko Dep.") at 31:17-20; Castillo Decl. Ex. I at 001039, 001046. The record does not show, nor does Garrett allege, that the results of the investigation into the October 18 incident had been

10

communicated to him.  Garrett was aware that he had been told not to go to the daycare center.
Castillo Decl. Ex. I at 001041.

Zirbel reported that she saw Garrett and began having a panic attack.  Castillo Decl. Ex.
N at 001570.  When Colletti received the call informing her that Garrett had returned, she could
hear Zirbel "wailing" in the background.  Colletti Decl. Ex. B at 001627.  That evening, New
Horizon's Vice President of Human Resources, Lisa Larson, emailed Castillo and Theriot
seeking answers for why Garrett had returned to the daycare facility after BSC had promised that
he would not be in the area.  Castillo Decl. Ex. M.

Garrett was placed on paid leave while BSC investigated.  Colletti Decl. ¶ 9.  Castillo and
Theriot interviewed Garrett on October 22, 2021, and asked him why he returned to the daycare
center.  Castillo Decl. Ex. I at 001041.  Garrett responded:

> I was doing pest control and when you guys told me not to go there, you said if I
> have any work can you get someone else to do it and you said you would get in
> touch with Dan, when I was doing pest control it was my normal routine, I did not
> think that passing through with pest control would be an issue.

Id.  When asked whether he believed that was a "lapse in judgment," he responded, "[in]
[h]indsight clearly."  Id.; Garrett Dep. at 164:20-165:3.  Castillo completed an Incident Report
summarizing her investigation and provided the documentation to Colletti.  Castillo Decl. Ex. I;
Colletti Dep. at 30:22-24.

On October 27, 2021, after consulting with Castillo and McKee, Colletti terminated
Garrett's employment.  Colletti Decl. ¶¶ 11-12; Colletti Dep. at 30:19-31:18.  Colletti states that
she fired Garrett for insubordination because he returned to the daycare center after specifically
being told not to do so while on a Final Written Corrective Action.  Colletti Dep. at 31:14-18,
33:7-13, 66:14-18; Colletti Decl. ¶ 11.

**G. Lawsuit**

After BSC terminated his employment, Garrett filed this lawsuit alleging race discrimination and retaliation in violation of the MHRA and 42 U.S.C. § 1981. BSC moves for summary judgment, arguing that Garrett has failed to establish a prima facie case of race discrimination or retaliation. BSC further contends that even if Garrett could establish a prima facie case for his claims, BSC had a legitimate, nondiscriminatory reason for firing him, and Garrett cannot reasonably establish that the reason is pretextual. Garrett opposes the motion, arguing that the evidence is sufficient to create a genuine issue of fact as to whether BSC's stated reason for firing him is pretext for discrimination or retaliation.

## III. DISCUSSION

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

there is no genuine issue for trial." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

**B. Analysis**

**1. Race Discrimination Claims**

Garrett claims he was fired based on his race in violation of Minn. Stat. § 363A.08 and 42 U.S.C. § 1981.  Second Am. Compl. [Docket No. 47] ¶¶ 46-52, 67-73.[1]  Because Garrett did not provide direct evidence of racial discrimination, his claims are analyzed using the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Lucke v. Solsvig, 912 F.3d 1084, 1087 (8th Cir. 2019); Johnson v. Schulte Hosp. Grp., Inc., 66 F.4th 1110, 1114 (8th Cir. 2023).[2]  Under this framework, the "plaintiff must first present a prima facie case of intentional discrimination.  The burden then shifts to [the] defendant to articulate a legitimate, nondiscriminatory reason for its action.  If [the] defendant meets that minimal burden, [the] plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful race discrimination." Putman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003).

**a. No Prima Facie Case**

To establish a prima facie case of race discrimination, Garrett must show "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered

---

[1]  The Second Amended Complaint also asserts a claim for hostile work environment in violation of Minn. Stat. § 363A.08.  See Second Am. Compl. ¶¶ 53-61.  Garrett did not raise any arguments in opposition to BSC's motion for summary judgment on this claim.  At oral argument, Garrett's counsel informed the Court that Garrett is no longer pursuing this claim.

[2]  Garrett agrees that his claims are subject to the McDonnell Douglas analysis.  See Pl. Mem. Opp'n Summ. J. [Docket No. 73] at 25, 30 (stating that McDonnell Douglas analysis applies).

an adverse employment action, and (4) the circumstances give rise to an inference of

discrimination."  Macklin v. FMC Transp., Inc., 815 F.3d 425, 427 (8th Cir. 2016).

Garrett has failed to satisfy the fourth element of a prima facie race discrimination case

because he has presented no evidence to support an inference that those involved in the

decisionmaking process harbored racially discriminatory animus against him.  It is undisputed

that Colletti made the decision to terminate Garrett's employment based on an investigative

report prepared by Castillo, with guidance from McKee.  Colletti Decl. ¶ 12; Colletti Dep. at

30:19-31:9; Pl. Mem. Opp'n Summ. J. [Docket No. 73] at 23.  Garrett has not adduced any

evidence of conduct or statements by Colletti that would support an inference of racially

discriminatory intent.  Indeed, Garrett admitted in his deposition that he "has no idea" whether

Colletti bore discriminatory animus toward him, and that he "barely knew who she was."  Garrett

Dep. at 169:25-170:2, 172:11-13.  As to Castillo and McKee, Garrett has never, in either his

reports of racism to BSC, his deposition, or his opposition to summary judgment, alleged that

Castillo or McKee discriminated against him.  See Garrett Dep. at 152:1-5; Castillo Decl. Ex. A;

Pl. Mem. Opp'n Summ. J.

Garrett nevertheless argues that a jury could conclude that Colletti harbored racial animus

toward him because (1) Colletti described Garrett as the "most toxic" person on the maintenance

team despite having almost no interaction with him, and (2) during the investigation into

Garrett's interaction with Zirbel on October 18, 2021, Colletti noted that Garrett was a "common

denominator" in workplace disputes.  Pasterski Decl. Ex. 19 [Docket No. 76, Attach. 4] at 47:7-

10; Castillo Decl. Ex. H at 001456.  Garrett argues that these comments show that Colletti's

treatment towards him was motivated by his race.

14

This argument is rejected because Colletti's comments are facially race-neutral and do not show racial bias.  See Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006) ("Facially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker.").  Colletti had been Garrett's Director for five years and was aware of his involvement in multiple workplace altercations.  See Colletti Decl. ¶ 4.  Any inference that Colletti's comments were reflective of his race, rather than his behavior, would be purely speculative.  See Twymon, 462 F.3d at 934 ("While we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation.").

Garrett also argues he can show discriminatory animus under the "cat's paw" theory of liability.  "Cat's paw" liability "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Qamhiyah v. Iowa State Univ. of Sci. & Tech., 566 F.3d 733, 742 (8th Cir. 2009) (quoting EEOC v. BCI Coca–Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)).  In the Eighth Circuit, the "rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design."  Id. (quoting Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006)).

"Cat's paw" liability does not apply here because the record shows that Colletti was an involved and informed decisionmaker, rather than a mere conduit or rubber stamp.  Upon learning that Garrett had returned to the daycare center, Colletti placed him on leave while the incident was investigated by Castillo and Theriot.  Colletti Decl. ¶ 9, Ex. B at 001626.  During

15

the investigation, Garrett admitted that he had returned to the daycare center after being told not to do so.  Castillo Decl. Ex. I at 001041.  Following the investigation, Colletti consulted with Castillo and McKee and before deciding to terminate Garrett's employment.  Colletti Decl. ¶ 12. Given this evidence, no reasonable jury could find that Colletti was used as a dupe to terminate Garrett's employment.

Because the evidence does not show circumstances that give rise to an inference of discrimination, Garrett cannot establish a prima facie case of race discrimination.

### b.  No Pretext

Even if Garrett could present a prima facie case, BSC offered a legitimate, non-discriminatory reason for firing him: he engaged in insubordination by returning to the daycare center after being specifically directed not to do so.  It is undisputed that Garrett, who had already been placed in a final written warning status, was instructed not to return to the daycare center pending an investigation into Zirbel's complaint.  Garrett Dep. at 161:9-16.  Castillo told Garrett: "you should not be going to the daycare center while this investigation is taking place," and "you should not be going to the childcare center for anything until the investigation is complete."  Castillo Decl. Ex. I at BSC_001048.  Garrett admitted that he heard this instruction and that he nevertheless returned to the daycare because he "did not think . . . [it] would be an issue."  Id. at BSC_001041; Garrett Dep. at 161:9-16, 164:7-19.

Garrett makes several arguments in an effort to show that BSC's stated reason is pretext for discrimination.  None have merit.  First, Garrett argues that there was no clear directive not to go to the daycare center.  However, Garrett admits that he heard and understood Castillo's instructions, and that his decision to return to the daycare center was a "lapse in judgment." Garrett Dep. at 161:9-23; 164:7-165:3.

Garrett also argues that he can show pretext because BSC purportedly applied its policies strictly to him while taking a "much more lenient approach to non-Black employees who engage in the same conduct." Pl. Mem. Opp'n Summ. J. at 32. Specifically, Garrett contends that non-Black employees with aggressive communication styles were not disciplined. Id. at 33.

"A common approach to show pretext is to introduce evidence that the employer treated similarly-situated employees in a disparate manner." Beasley v. Warren Unilube, Inc., 933 F.3d 932, 938 (8th Cir. 2019). The test for showing whether someone is similarly situated is "rigorous" and requires the plaintiff to show "that he and the employees outside of his protected group were similarly situated in all relevant respects." Id. "This means that the plaintiff and the potential comparators must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id. (quotations omitted).

Garrett's argument misses the mark because he was fired for insubordination, not for his communication style or his confrontation in the daycare center. Garrett provides no evidence of another employee receiving more favorable treatment after engaging in insubordination after receiving a final written warning. As such, he has failed to meet the rigorous test for showing that similarly situated employees outside of his protected group received more favorable treatment.[3]

_____

[3] Even if BSC's concerns with Garrett's communication style were somehow relevant to the similarly-situated analysis, Garrett has not shown that he was treated differently than non-Black employees who engaged in aggressive communication. The record shows that Garrett received only one disciplinary action for his communication style---a Verbal Counseling following the 2017 café incident---and he admitted that it was warranted given his conduct. Garrett Dep. at 103:20-25. For the other instances involving Garrett's communication concerns, he received the same treatment as other employees: coaching. See Mikolich Decl. Ex. C at 000842 (showing Helser received coaching), Ex. E at 001256 (showing Garrett received coaching); Castillo Decl.

17

Garrett further argues that Castillo failed to investigate his reports that Limkar and Fearing were discriminating against him, and that this alleged failure to investigate demonstrates pretext.  This argument fails for at least two reasons.  First, Castillo's investigation into Garrett's discrimination reports was wholly independent of the investigation into the conduct that led to Garrett's discharge.  See Castillo Decl. Exs. A, I.  The purported failure by Castillo to investigate Garrett's reports of discrimination is not probative of whether discrimination was the real reason that Colletti terminated Garrett's employment following his misconduct on October 21, 2021.  Second, the record shows that Castillo did investigate Garrett's reports by obtaining statements and information from at least five BSC employees and conducting over half a dozen interviews with Garrett.  See Castillo Decl. Ex. A.

Garrett also argues that biased statements by those involved in the decision to terminate his employment create a factual dispute as to whether the decision to fire him was motivated by his race.  However, Garrett has presented no evidence that those involved in the decision to fire him exhibited racial animus toward him.

Because Garrett has not provided sufficient evidence for a prima facie case of race discrimination and has failed to show that BSC's proffered reason for his firing was pretextual, BSC is entitled to summary judgment on Garrett's race discrimination claims.

### 2.  Reprisal and Retaliation Claims

Garrett also claims he was fired for engaging in protected conduct, and that BSC's actions constitute unfair reprisal under the MHRA, Minn. Stat. § 363A.15; and retaliation under 42 U.S.C. § 1981.  Second Am. Compl. ¶¶ 62-66, 74-78.

---

Ex. A at 001023 (showing Fearing received coaching); Pasterski Decl. Ex. 19 at 49:24-50:3 (stating Limkar received coaching).

Claims for MHRA reprisal and § 1981 retaliation are analyzed under the McDonnell Douglas burden-shifting test.  Johnson, 66 F.4th at 1115; Onyiah v. St. Cloud State Univ., 5 F.4th 926, 930 (8th Cir. 2021).  To establish a prima facie case of retaliation or reprisal, a plaintiff must show that (1) he engaged in a protected activity, (2) the defendant subsequently took materially adverse action against him, and (3) a causal connection exists between the two. Johnson, 66 F.4th at 1115, 1118; Onyiah, 5 F.4th at 930.

Garrett cannot satisfy the third element because he has produced no evidence showing a causal connection between his protected activity and his discharge.  Resisting this conclusion, Garrett argues that the timing between his protected reports and his discharge creates an inference of discrimination.  Garrett contends that Colletti became aware of his protected activity in late July 2021, and he was discharged less than three months later.

"The timing of an adverse employment action in connection with the protected activity 'can sometimes establish causation for purpose of establishing a prima facie case.'"  Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 915 (8th Cir. 2006) (quoting Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir.2000)).  However, "[t]he cases that accept mere temporal proximity" as sufficient evidence of causality for a prima facie case "uniformly hold that the temporal proximity must be very close."  Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).  The Eighth Circuit has repeatedly held that without additional evidence of retaliatory animus, an interval of more than two months is too long to support an inference of causation.  Onyiah, 5 F.4th at 930; Lissick v. Andersen Corp., 996 F.3d 876, 883 (8th Cir. 2021); Williams v. United Parcel Serv., Inc., 963 F.3d 803, 808 (8th Cir. 2020).  Additionally, timing alone is insufficient to establish a causal connection if a plaintiff engages in intervening unprotected conduct.  Johnson,

19

66 F.4th at 1117-18; Mervine v. Plant Eng'g Servs., LLC, 859 F.3d 519, 527 (8th Cir. 2017);

Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

Garrett admits that there was at least a three-month time span between his protected

conduct and his discharge.  This interval is too remote as a matter of law to infer a causal

connection.  In addition, Garrett's intervening act of insubordination on October 21, 2021

severed any causal connection based on temporal proximity.

Any inference of causation is also negated by evidence showing that Colletti was aware

of Garrett's protected conduct when she made the decision not to terminate his employment

following his initial interaction with Zirbel on October 18, 2021.  It was not until Garrett

disregarded the directive not to return to the daycare center that Colletti chose to fire him.

Because Garrett cannot establish a prima facie case of reprisal or retaliation, those claims

fail.  Additionally, even if Garrett could establish a prima facie case of reprisal or retaliation, he

has failed to present sufficient evidence from which a reasonable jury could conclude that BSC's

legitimate, non-discriminatory reason for firing him was pretext for retaliation.  Accordingly,

BSC is entitled to summary judgment on Garrett's reprisal and retaliation claims.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**
that:

1.    Defendant Boston Scientific Corporation's Motion for Summary Judgment
      [Docket No. 59] is **GRANTED**; and

2.    The Second Amended Complaint [Docket No. 47] is **DISMISSED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 30, 2024